4-ONE BOX MACHINE MAKERS

*vs.*

WIREBOUNDS PATENTS COMPANY.

Cumberland.     Opinion, February 23, 1932.

*Verrill, Hale, Booth & Ives,* for plaintiff.
*Woodman, Skelton & Thompson,* for defendant.

SITTING: PATTANGALL, C. J., DUNN, BARNES, FARRINGTON, THAXTER, JJ.

DUNN, J.    This is an appeal by the defendant from an equity decree. The cause was heard on bill, answer, replication, and proof. The bill of complaint, which was filed in the Supreme Judicial Court in Cumberland County, by one Maine corporation against another, prays the cancellation of a notice of election to terminate a license relating to patents; the enjoining of collection of royalties except at a specified rate; the reduction of royalty rates, because of partial eviction; and other and further relief.

The answer denies the material allegations of the bill; asserts that a promise on which the plaintiff relies was voluntary and without consideration; pleads the statute of frauds; and the commencement by defendant's assignee, prior to the present litigation, in a judicial court of competent jurisdiction in the State of New

York, of an action at law wherein this plaintiff, as defendant, has appeared and entered a general denial, in which action — so assertion continues — all the questions and issues attempted to be here raised, are raised.

The decree sustains the allegations in the bill, aside from those relating to partial eviction, and the prayer for relief in connection therewith. As to partial eviction, the decree recites that adjudication is unnecessary.

A stipulation by the parties, on review, removes the question of partial eviction, and the issues raised thereby; this without prejudice to either party's right to try those issues in a separate suit.

On May 16, 1916, the plaintiff became the licensee of certain patents and patent rights — of various lengths of unexpired terms, covering the manufacture and use of machines and methods for making folding wirebound boxes, and the use and vending of the manufactured product itself — which the defendant owned or controlled.

The record shows, and the briefs discuss, a prior relationship, in which the purchase from a third person, of patents held by him, was deemed desirable. To accomplish this purpose, the defendant corporation was formed. It acquired the patents, and entered into the license agreement which this suit involves. The license was inclusive of any patents of the United States or Dominion of Canada (and any license or other patent right) "now or hereafter owned or controlled by the Licensor." The license, though its language in such behalf is not express, is exclusive.

The agreement recognized the validity, for the full terms designated in the grants thereof, of all the patents, respectively, unless sooner terminated by the licensor under reserved power; authorized the granting of sub-licenses; obligated the licensee to prosecute infringers at its own expense; to pay costs and expenses and final judgments and decrees in any action or suit against the licensor for alleged infringement; exacted diligence in introducing the machines and boxes into public use; and bound the licensee to pay the licensor, annually, as royalty, sums of money computable on percentages; the minimum in any event to be $25,000, though this should involve the payment by the licensee of an amount additional to the percentages on boxes made and sold or used, under

the license; and on damages from infringements, and bonuses from sub-licensees.

The power reserved to the licensor permitted termination of the license for default of any imposed condition. A provision requires that the licensor shall serve, upon the licensee, written notice of intention to terminate the license, stating the reason.

After notice, the licensee has sixty days in which to remedy "such cause."

October 11, 1929, defendant gave plaintiff notice of intention to revoke the license, the causes enumerated numbering seven.

These were the granting of sub-licenses at variance with the form prescribed by the license agreement; the alteration of sub-licenses; failure to make annual reports; to assign newly acquired patents; to bring suit for infringements; and to pay royalties. The notice also charged that the licensee violated the license, in spirit and intent, by a transfer of assets to a corporation which it had been instrumental in organizing; and by failure to account for royalties accruing from still another corporation.

The annual reports which were in arrears have since been furnished.

The bill of complaint alleges that the other causes are false or immaterial; or have been approved by the defendant; and that none of them, even if established, would constitute ground for the termination of the license.

On objection by the plaintiff, Exhibits G and H were ruled out by the Justice hearing the cause, as privileged communications. Exceptions were saved.

In making up the report on appeal, the excluded exhibits were included, so that if held material, they might have consideration with the rest of the evidence. *Redman* v. *Hurley*, 89 Me., 428, 434; *Trask* v. *Chase*, 107 Me., 137, 150.

Counsel for the plaintiff, in their brief, waive exception to the exhibits.

The chief contention at the trial was as to how long the plaintiff was entitled to a partial reduction of royalty rates. The payment of any balance which might be found due was assured.

Invoking the doctrine of equitable estoppel, the Justice decreed the defendant barred from withdrawing the reduced rates and

restoring the old, until the time of the decision, by the United States Circuit Court of Appeals, Sixth Circuit, of a certain patent suit.

The appeal presents many questions. This court differs from the trial court only regarding the application of the doctrine of estoppel.

Litigation had been, in the phrase of a witness, more or less continuous. Some decisions had been adverse to the validity of the patents.

In 1925, the District Court of the United States, in the Northern Illinois District, dismissed a bill of complaint in an infringement suit begun by the plaintiff, for want of equity. The appeal court affirmed the decision, opinion being handed down February 6, 1928.

In 1927, in a Michigan district, the United States Court held the basic patents (those previously mentioned as acquired by the defendant) invalid. This decision was reversed on appeal, but the appeal had not been argued at the time of the decision in Illinois.

Sub-licensees became restless. Their businesses might fail for want of legally sufficient foundations. They hesitated to go on. Inactivity on their part meant less revenue for the plaintiff; and perhaps for the defendant. Some sub-licensees threatened to surrender their licenses; others refused to pay royalties; others insisted on reductions.

The situation was forbidding.

To allay fears, prevent the surrendering of sub-licenses, and protect its business, plaintiff conceded royalty abatements, revocable on thirty days' notice.

The sub-licensees finally agreed to pay, the largest making payment under protest.

Plaintiff asked defendant for a corresponding reduction.

The person acting as intermediary was a director, vice president, and general counsel for the plaintiff, and at the same time, one of the directors, and president of the defendant.

His effort to serve two masters, and be faithful to both, was unsuccessful; he eventually fell into embarrassment.

However, while acting in dual capacity, he interviewed individ-

ual directors of the defendant, including himself, with a view to obtaining royalty reductions.

Under a by-law of the defendant, its directors need not necessarily meet and act by formal vote. If a resolution in writing, which shall have been presented for action to all the members of the board, and which shall have been approved and signed by a majority, is thereafter, with the original or duplicate signatures of such directors, inserted in and made a part of the recorded minutes of the directors' meetings, it shall be deemed lawful and effectual action by such board, to the purpose and extent expressed in the resolution, with the same force and effect as though duly passed at a meeting regularly convened. The amendment or revision of a license requires the vote of not less than four-fifths of the members of the board of directors.

That is what occurred in this case.

A draft of resolution of a partial waiver of royalties (embodying a draft of letter addressed to the plaintiff, the letter bearing date of March 7, 1928) was initialed by all the directors; not by all on the same day, but as opportunity presented, on March 7, March 8, and the early forenoon of March 9, 1928.

The resolution gave authority to, and directed the president and secretary of the defendant to write and deliver to the plaintiff a letter, which reads as follows:

"Wirebounds Patents Company
Rockaway, New Jersey
March 7, 1928.

4-One Box Machine Makers,
Rockaway, New Jersey.

Gentlemen:—

This letter and the basis of payment hereinafter set forth, shall be effective only until the date upon which the undersigned shall deliver to you written notice withdrawing this letter and declaring the basis of payment hereinafter set forth as of no further force or effect, and shall be without prejudice to any and all the other provisions in the license between the undersigned and 4-One Box Machine Makers dated May 16,

1916. Upon delivery to you by the undersigned of the written notice above mentioned said license of May 16, 1916, shall immediately be and become in all its terms and conditions in full force and effect.

We hereby agree that you may pay us for business done by you under said license of May 16, 1916, from February 1, 1928, until date of delivery of written notice above mentioned declaring this letter withdrawn, on the below mentioned basis, any further payments on account of business done by you under said license during said period being hereby finally waived by the undersigned.

Upon business done in Canada, you to pay the undersigned $\frac{3}{4}$ of 1% of the gross sales of boxes made and sold by your Canadian license.

Upon business done in the United States by your licensees who make and use boxes, you to pay the undersigned 1% of the fair market value of the boxes made and used by such United States licensees, except Kingan & Company of Indianapolis.

Upon business done in the United States by your licensees who make and sell boxes, you to pay the undersigned 3/10 of 1% of the gross sales of boxes made and sold by such United States Licensees, which Licensees shall be held to include Kingan & Company of Indianapolis.

If any licensee refuse and/or fail to pay you royalty upon business done by such licensee during the period this letter is effective, then and in such event you shall be released from paying the undersigned for such business, unless thereafter the licensee pay you the royalty for such business, in which case you shall pay the undersigned for such business upon the basis herein before set forth.

Yours truly,

Wirebounds Patents Company,

By (Daniel P. Murphy),

Attest:                                                    President.

(Clarence L. Millard),

Secretary."

The royalty rates of the license agreement are:

(a) 1 per cent. of the gross sales of all boxes made and sold under this license, by the licensee and sub-licensees.

(b) 1 per cent. of the fair market value of all boxes made and used under the license by the licensee and sub-licensees.

(c) 30 per cent. of the net damages and profits, or either, received by the licensee from infringers.

(d) 30 per cent. of any cash, or stock bonuses, received by the licensee from any sub-licensee.

At 9:30 on the morning of March 9, the full board of directors met. No minutes of the meeting were made. In such a case, action taken may be established by parol. *Peirce* v. *Morse-Oliver Building Co.*, 94 Me., 406; *York* v. *Mathis*, 103 Me., 67; *Hyams* v. *Old Dominion Company*, 113 Me., 294, 299.

Evidence warranted the finding that there was discussion at this meeting concerning the period over which royalty reduction should extend.

The consensus of opinion was that reduction continue until decision on the appeal in the patent case in the Sixth Circuit. It was, however, unanimously voiced that the resolution show that the reduction might be withdrawn, on written notice, at the pleasuse of the board.

A copy of the resolution, as originally drafted and initialed by the directors, was then signed, and fastened into the record book of directors' meetings. The meeting adjourned.

The president of the plaintiff was in Cuba. On his return home, about ten days later, the letter was brought to his attention.

He scorned it, saying it was "as good as nothing."

Later in the day, he was told by the intermediary that the directors had agreed reduced rates should continue to the time of the decision of the patent suit.

On the strength of this (so the Justice found) the plaintiff continued active in business, increasing its efforts, enlarging its laboratories, and extending research.

It was ruled that the royalty recession contained in the letter of March 7, 1928, was not revocable at the will of the defendant, but binding up to the date of the decision of the patent suit.

The law enforces estoppel in pais — the rule of good morals — as a rule of policy. The doctrine of estoppel rests on an act that has misled one who, relying on it, has been put in a position where he will sustain a loss or injury. *Patton* v. *Catlettsburg Nat'l Bank* (Ky. 1923), 255 S.W., 690, 693; *Davis* v. *Briggs*, 117 Me., 536.

Assuming the material facts as favorably for the plaintiff as the evidence will permit, the plaintiff, on receiving the letter, and after the qualifying spoken statement, did only what the terms of the license agreement obliged it to do; it continued "diligent in introducing such machines and boxes into public use."

Contention that the licensee would not have extended its efforts, but would have curtailed business, and paid royalty at the rate of only $25,000 yearly, had it not been for the statement that no change of royalty should be made until the announcement of a decision in the infringement case, cannot be upheld.

The license agreement, as has before been noted, required the minimum payment by the licensee of $25,000 a year, even though the aggregate of percentages was less than that. The waiver which the letter of March 7, 1928, evidenced, aside from releasing liability for royalty which any sub-licensee might not pay, only purported to reduce percentage rates on account of business done.

The annual payment of royalty was, in fact, always more than $25,000. Beginning with 1918, to and inclusive of 1927, the differing amounts in different years were three times, four times — with a comfortable margin — once, almost five times, that sum. In 1928, the waiver notwithstanding, the royalty was in excess of $50,000.

One's agreement to do that which an existing contract binds him to do, cannot constitute a consideration for a new promise, on the part of him whom performance would benefit. This is recognized in *Wescott* v. *Mitchell*, 95 Me., 377. See too, *Savage* v. *North Anson, etc., Company*, 124 Me., 1.

The partial waiver of royalty made to the plaintiff by the defendant, was revocable at the pleasure of the latter. The spoken statement added nothing. Like the letter, it was without any consideration, actual or imported. Besides, the statement was not relied on. The plaintiff was not led thereby to change its position for the worse. *Tower* v. *Haslam*, 84 Me., 86, 90.

The royalty waiver was formally withdrawn on May 20, 1929.

The appeal is sustained, but for no other purpose than that of remanding the cause for the entry of a decree which shall modify the original decree as this opinion indicates. In all other respects, the decree below is affirmed.

*So ordered.*