Thaxter, J.
The plaintiff in this case, a licensee under letters patent, has brought a bill in equity against the licensor alleging the invalidity of three of the basic patents, and prays for an injunction against the defendant’s cancelling the license because of the plaintiff’s refusal to pay royalties and for damages in consequence of the plaintiff’s loss of the monopoly, which resulted from the finding that the patents were void. To this bill the defendant has filed a general demurrer, and by agreement of the parties the cause is reported to this court for final determination of all questions of *358 law with a right reserved to the defendant to answer should the demurrer be overruled.
The facts set forth in the bill in brief are as follows. The plaintiff as licensee under the original name of “Wirebounds Corporation” entered into an agreement with the defendant as licensor. The first clause of this reads as follows:
“1. The Licensor hereby licenses the Licensee to make and use machines, and to make, use and sell boxes, and to use methods, and to license sub-licensees so to do, under any patents of the United States and of the Dominion of Canada (and under any license or other patent right) now or hereafter owned or controlled by the Licensor.
“The Licensor covenants that it will not during the life of this license grant any license or other right to any other person under any patent or patent right covered hereby.”
A royalty was to be paid to the defendant, the essential part of which was 1% of the gross sales of all boxes made and sold under the license by the licensee and its sub-licensees, with a guaranteed minimum payment of $25,000 per year. The licensee was required to assign to the licensor without compensation all patents, and applications therefor, licenses and inventions in respect of such mar-chines, boxes or methods now or hereafter owned by the licensee which would in turn under the provisions of clause 1 become subject to the license. The license was to continue during the life of any patent or patent right subject to its terms. A list of patents as of May 1, 1916, numbering forty-five is made a part of the agreement. It also provided that certain licenses dated April 11, 1911, from William P. Healy to the plaintiff and assigned by Healy to the defendant should remain in force as modified by the license agreement. There was also a provision for termination of the license by the licensor on default by the licensee. The licensor further agreed to give the plaintiff the first opportunity to purchase if the licensor should desire to sell its interest. The plaintiff agreed that it would be diligent in introducing the machines into public use in the United States and Canada.
Sections 10,11 and 12 of the license read as follows:
*359 “10. The Licensee admits the validity, for the full terms expressed in the grants thereof, of all the patents,- respectively, now or hereafter covered by this license.
“The Licensee agrees that it will not at any time hereafter directly or indirectly infringe such patents, nor dispute, nor contest, the validity of any such patents, or the novelty or utility or patentability of any subject matter of any such patents, or the title thereto or the interest therein of the Licensor ; nor directly nor indirectly assist any other person in contesting the same; and that such patents shall throughout their respective terms, and for all purposes, be deemed to be in force and valid.
“The Licensee agrees that the expiration of this license, or its termination, shall not in any way affect the operation of this section, nor release, nor discharge, the Licensee from its obligations, or its admissions or estoppels herein contained.
“11. During the life of this license, the Licensee shall prosecute at its own expense infringers of the patents covered hereby. The Licensee may join the Licensor as complainant in such suits, but without expense to the Licensor, and the Licensee shall pay any final judgment or decree that may be rendered against the Licensor in any such suit, and if not so paid, the same shall become a debt due from the Licensee to the Licensor under this license; provided, that if the Licensee refuse for three months to prosecute any such infringer, after written demand, then the Licensor may thereafter prosecute such infringer, and if the defendant in such suit is adjudged in the trial court or in the court of final jurisdiction to be an infringer, as charged in the complaint or declaration, then the Licensee shall immediately thereafter owe to and reimburse the Licensor for all its expenses of every kind and nature incurred in the matter of such suit; provided further that the Licensor hereby agrees to pay to the Licensee 70% of the net damages and profits, or either, received by the Licensor from such infringer in such suit.
“12. If any person shall hereafter bring any action or suit against the Licensor for alleged infringement by the Licensee, or by any sub-licensee, of any patent or patent right of such *360 person, the Licensee shall pay all costs and expenses of every kind and nature of such action or suit, and shall pay all final judgments and decrees that may be rendered against the Licensor in such action or suit.
“Any final judgment or decree rendered in any action or suit mentioned hereinbefore in this section and in Section 11 hereof shall be a debt, due and payable forthwith from the Licensee to the Licensor under this license, for a sum of money equal to the amount of such judgment or decree, including taxed and other costs and expenses.
“The Licensee shall also pay such costs, expenses and final judgments and decrees, in infringement or other suits, when the action or suit is against the Licensee, or any sub-licensee.
“Any such judgment or decree mentioned in this section and in Section 11 hereof which shall have been superseded by appeal, Writ of error, or otherwise, shall not for the purpose of this instrument be considered final.”
Operating under this license the plaintiff invested a large amount of capital in the box business, did extensive development work, granted sub-licenses, built up a thriving business which was profitable both to itself and its licensor, and patented new inventions which it assigned to the defendant in accordance with the provisions of its agreement. In the thirteen year period from 1916 to 1928 the defendant received in royalties from the plaintiff $1,181,326.39. The plaintiff prosecuted successfully various infringement suits.
It is set forth in the bill that there were four basic patents, No. 12,725 reissue dated November 26, 1907, and No. 1,128,144, No. 1,128,145 and No. 1,128,252 each dated February 9, 1915, and that the other patents owned by the defendant on May 16, 1916, and subject to the agreement were subordinate to these and alone were of very little value. No. 12,725 expired September 19, 1922, the others ran till February 9,1932. About the time of the expiration of the first, the Saranac Automatic Machine Corporation started building and selling machines which were covered by the claims of the other three patents. One of these machines was sold to the Gibbons Box Company against whom an infringement suit *361 was started by the plaintiff in the United States Court in Illinois. In the District Court this suit was dismissed on April 11, 1925. An appeal was taken to the Circuit Court of Appeals for the Seventh Circuit, which in a decision rendered February 6, 1928 found patent No. 12,725 valid and the others invalid. A second suit was started against the Saranac Automatic Machine Corporation in the District Court in Michigan charging the infringement of patents No. 1,128,144, No. 1,128,145 and No. 1,128,252. On July 6,1927, the court found all of these patents invalid, and an appeal was taken to the Circuit Court of Appeals for the Sixth Circuit, which announced a decision January 25,1930, holding patent No. 1,128,145 valid and infringed. On February 24,1931, the Supreme Court of the United States reversed this ruling of the Circuit Court of Appeals in so far as it involved No. 1,128,145. As a result of this litigation the invalidity of the three remaining so called basic patents has been definitely established.
Owing to the competition which followed the announcement of the District Court decisions, the plaintiff reduced the royalties charged by it to its sub-licensees and its own business was likewise adversely affected. The defendant on its part by letter dated March 7, 1928, reduced the royalty to be paid by the plaintiff to 3/10 of 1%. On May 20,1929, the defendant by letter attempted to rescind this action, and its right so to do was the basis of previous litigation between these same parties which resulted in the decision reported in 131 Me., 70, 159 A., 496. By stipulation of the parties in that case the question of partial eviction, which is the foundation of the plaintiff’s present claim, was left open and was not decided by this court.
The plaintiff contends that the license granted to it was exclusive, that the defendant purported to convey a monopoly in the making, using and selling of the patented invention, and that when that monopoly failed by reason of the basic patents being declared invalid and by the consequent competition by outsiders, there was an eviction pro 'tanto from the benefits sought to be conferred, for which the defendant must answer in damages. An injunction is sought against the collection of further royalties by the defendant until the damages due the plaintiff shall have been determined and paid.
*362 The defendant claims that the license purports to give to the plaintiff a mere permission to do certain things, which, by reason <of the grant of the letters patent, the licensor could have prevented the licensee from doing, and that this permission is coupled with a ■covenant that the defendant will not convey similar rights to anyone else. As a consequence the defendant contends that the finding of invalidity of the basic patents neither gave the plaintiff any claim for damages nor affected its obligation to pay the designated royalty.
■The plaintiff’s argument seems to be predicated on the assumption that an exclusive license is equivalent to a transfer of the right in the monopoly, which the licensor purports to own. But a license ■can be exclusive and not convey such right, as for example where there is the grant of an exclusive right to make, use and sell the invention for certain limited purposes, or the right to make, use and sell it for all purposes ,to the exclusion of all except the licensor. There is an interesting discussion of this general subject in Robinson on Patents, Vol. II, Secs. 806-808. The learned author in commenting on the difference between a license, which does not convey the monopoly, and an assignment, which does, points out that the monopoly is indivisible and remains in the patentee until he transfers all rights to it or makes someone else a joint owner with himself. He says, Sec. 807: “The only alienation which can carry the monopoly is that of the exclusive right, or of an undivided interest in the exclusive right, to practise the invention, including the exclusive right to make, the exclusive right to use, and the exclusive right to sell the patented invention.” Such a grant he holds is in effect an assignment and not a license. In contradistinction he says, Sec. 808: “All alienations of the right to make, or the right to use, or the right to sell, or of the right to make and use, or of the right to make and use and sell, are merely licenses.” To the same effect is the language of Chief Justice Taft in United States v. General Electric Co., 272 U. S., 476, 489: “The owner of a patent may assign it to another and convey (1) the exclusive right to make, use and vend the invention throughout the United States or (2) an undivided part or share of that exclusive right or (3) the exclusive right under the patent within and through a specific part *363 of the United States. But any assignment or transfer short of one of these is a license giving the licensee no title in the patent and no right to sue at law in his own name for an infringement.”
The plaintiff calls attention to the language of this court in the opinion in 131 Me., 70, 72, 159 A., 496, in which it is stated that this license is exclusive, and counsel, then placing on the phrase “exclusive license” their own interpretation, argue that the question is res adjjudicata. If as is stated by them this issue has been decided, and if it follows necessarily as they say that an eviction under an exclusive license occurs on a declaration of invalidity of the patent with a consequent inability of the licensee to prevent an unauthorized use, the question of eviction which is now being argued would likewise seem to be closed. Yet counsel have stipulated in the previous case and the court there found that the question of eviction was open. It is obvious therefore that we did not hold that this license is exclusive in the sense in which the defendant uses that term, namely, that it purports to grant an exclusive right or a monopoly on the failure of which a right of action would accrue.
The real point at issue is the proper construction of the license agreement. It is not so much a question whether the license is exclusive or non-exclusive, as one or the other party uses those terms, but what was the contract which these parties made, what rights did they intend to create, and what liabilities did they expect to assume.
In interpreting such contract the ordinary rules of construction apply. Walker on Patents (6 ed.) Sec. 354, 48 C. J., 266. The primary purpose is to determine “what intention or purpose is expressed by the words and phrases used. It is that meaning by which the parties are bound, even though one or the other honestly believed the language to have a different meaning.” Union Water Power Co. v. Lewiston, 101 Me., 564, 569, 65 A., 67, 69. Only if the language is ambiguous can the surrounding circumstances be considered in an effort to determine the intent. Ames v. Hilton, 70 Me., 36; Snow v. Pressey, 85 Me., 408, 27 A., 272; Strong v. Carver Cotton Gin Co., 197 Mass., 53-59, 83 N. E., 328.
This is a case of which this court has jurisdiction. It involves a *364 contract of which a patent is the subject-matter, but it does not arise under the patent laws. Wade v. Lawder, 165 U. S., 624; Marsh v. Nichols, Shepard & Co., 140 U. S., 344.
The license agreements on their face appear to have been drawn with the very greatest care, not by novices, but by those experienced in the art of exact phrasing, who had a full knowledge of the special branch of the law with which they were dealing.
At the outset it may be well to point out that here there is no express warranty of the validity of any of the patents, and that in the transfer of patent rights by license no such warranty will be implied. Standard Button Fastening Co. v. Ellis, 159 Mass., 448, 34 N. E., 682; McKay v. Smith, 39 Fed., 556; Victory Bottle Capping Machine Co. v. O. & J. Machine Co., 280 Fed., 753, 757; Robinson on Patents, Vol. II, Sec. 783, Note 4; Walker on Patents, Yol. I, Sec. 355. Had the granting clause of this license contained language showing an intent to convey a monopoly in the making, using and selling of boxes under the patents in question, we might well hold that the licensee would not be without remedy should it receive something less than that for which it bargained. Judkins v. Earl, 7 Me., 9. As is pointed out by the plaintiff a failure of consideration is a defense pro tanto against a claim for payment in a contract, or it may give to the party injured a separate cause of action. Clause 1 of the license in question does not, however, by its terms convey a monopoly. It distinctly refrains from so doing. The defendant licenses the plaintiff to make and use machines, and to make, use and sell boxes and to license sub-licensees so to do under certain patents. Then follows a covenant that the defendant will not license others to do the same thing. Instead of the grant of a monopoly, the defendant has merely given to the plaintiff permission to operate under the patents coupled with a covenant to license no one else to do so. In short the language used at the outset shows an intent not to do that which the plaintiff claims was done. The phrasing was appropriate if the patents were valid to create in practical effect a monopoly in the use of the invention in the plaintiff, subject to the rights of the licensor; and it may well be that it was the expectation of the parties that such would be the result. This outcome would, however, be reached not because the defendant made an exclusive grant, but by reason of *365 the fact that it had estopped itself from giving a similar permission to anyone else. This is a distinction which has a real effect on the rights and remedies of the parties, for if there were the grant of an exclusive right, there might well be a failure of consideration, if the licensee did not receive it. On the other hand if there is a grant of a right to operate under the patents with a covenant by the licensor such as we have here, the only liability which the licensor intends to assume is in case he shall breach that covenant by granting licenses to others. In other words the prohibitory covenant does not enlarge the scope of the right previously granted.
The plaintiff contends, however, that in the .sub-licenses which are appended to the main agreement the parties have referred to the grant in the plaintiff’s license as exclusive. This recital reads as follows : “Wirebounds Patents Company has, by written license, granted to the licensor exclusively the right, etc.” We think that this aptly describes just what appears to us to have been given by clause 1 of the license. We concede that the meaning might be different if this recital had read “has granted to the licensor the exclusive right,” for in such case the word “exclusive” would define or characterize the extent of the right granted. The language actually used means only that the defendant has granted to the plaintiff rights under the patent with no implied covenant of their -validity and that in the future the licensor will not give similar rights to anyone else.
. The plaintiff, moreover, under the terms of the license has no right to vend any machines itself and in fact the title to all machines built under the patents is to vest in the licensor. Such right of the defendant is inconsistent with the claim of the plaintiff that a monopoly was granted. Furthermore it nowhere appears in the pleadings set forth in the record that the licensor has given up its right as owner of the patents to make or use the patented machine itself, or to make, use and sell boxes. All that it agrees to do is not to license anyone else to do so. The rights which the licensor retained it can sell.
In this respect this license is very similar to that-construed in Mayer v. Hardy, 127 N. Y., 125, 27 N. E., 837. In this case the owner of a patent for an improvement in corset clamps granted to the plaintiffs a license to make, use and sell them for the term of *366 the patent. She covenanted not to license more than one other person to do the same thing. This second license was subsequently granted. Thereafter the patentee assigned all of her right, title and interest in the invention to the defendant who proceeded to manufacture and sill the patented article. An injunction was sought against his doing so, but the court held that this was a right retained by the patentee which she could assign to the defendant. The language of the court at pages 132-133 is significant: “The plaintiffs insist that they took by the license, except as against one other licensee, the exclusive right to the use of the patent. Although such may have been the understanding of the plaintiffs, the patentee was not by the terms of the agreement denied the right to manufacture and sell the patented article, nor was she by any express provision of it required to retain the title in herself. Her covenant was that she would grant a license to one other person, firm or corporation only. She held the title to the patent and did not grant the exclusive right to its use to the licensees, but made the covenant before mentioned with a view to the protection, to that extent and in that manner, of the privileges granted to them. The assignment of the patent apparently carried with it to the assignee all the rights which remained in her in respect to it.”
In seeking the intention of the parties we are not, however, to consider the language of any part of the instrument by itself. We must look at the agreement as a whole to see “how far one clause is explained, modified, limited, or controlled by others.” Ames v. Hilton, supra, 43. In so doing we find a significant explanation of the phrasing of the granting clause, and evidence that the meaning of the words as used was just what the parties intended.
In the first place the license covered a large number of patents in addition to the three basic patents which have been declared invalid. The royalty to be paid was an entirety. It was paid not only for such rights as were transferred but for rights that were to be assigned to other patents in the future. It was clear, moreover, that the license was to continue, with the obligation on the plaintiff’s part to pay royalties at the same rate including the minimum payment of $25,000 a year, long after any rights under the basic patents had expired, and when the plaintiff would have to meet the very competition for which it now seeks compensation from the *367 defendant. The plaintiff in its bill does claim that the other patents were worthless except as supplementary to the basic patents, but its willingness to continue to pay for them after the expiration of the three here involved refutes this allegation. In fact the plaintiff admits that it is only asking for damages up to the time when these patent rights would expire in February, 1932; and thereafter presumably it stands ready to pay at the old rate. The truth would seem to be that the plaintiff agreed to pay compensation for such rights as it obtained from the defendant under a large number of patents considered as a whole.
Furthermore if as the plaintiff contends the defendant purported to convey to the plaintiff a monopoly, it is strange that an exception was not made of such rights as admittedly had been given to certain others prior to the execution of the license agreement. Such omission is only consistent with a grant of rights subject to any prior transfers and subject to any defects.
But in addition to these observations on the agreement the specific provisions of sections 10, 11 and 12 would seem to negative any claim that there was here as the plaintiff claims a conveyance of an exclusive right with an implied covenant analogous to one of quiet enjoyment.
Section 10 is in effect an admission by the licensee of the validity of every patent and contains an agreement not to dispute such validity. The plaintiff contends that this is the usual covenant contained in such agreement, that its purpose is to prevent the licensee from actively seeking to overthrow the patent, and that there is no’ estoppel against setting up the fact of invalidity established by judicial decree. The case of Schutte & Koerting Co. v. Wheeler Condenser & Engineering Co., 295 Fed., 158, is cited in support of such proposition. The license involved in this cited case, however, purported to convey “the sole and exclusive right” to the patent in question, language which is quite different from that with which we are dealing. There is, moreover, a further clause in section 10 which was not present in the agreement construed in the case cited which reads “that such patents shall throughout their respective terms, and for all purposes, be deemed to be in force and valid.” It would be difficult to conceive of much broader language; and one obvious purpose, for which the plaintiff agreed that the patent *368 should be deemed valid, was to assure the payment of the agreed royalty.
In Pope Manufacturing Co. v. Owsley, 27 Fed., 100, the language of the granting clause was substantially the same as in ■clause 1 of this license except that the licensor did not covenant not to grant similar rights to others. The licensee agreed that it would not dispute or contest the validity of the patents. The court held that a finding that the patents were invalid did not relieve the licensee of the obligation to pay the royalties. The court said, page 108: “By taking the licenses, these defendants waived and abandoned their right to contest the validity of these patents, or any of them, and agreed to pay the stipulated license fees; and merely because some one else has successfully contested the validity of one or more of these patents the defendants are not relieved from their obligations.”
In United Shoe Machinery Co. v. Caunt, 134 Fed., 239, there was a lease of a patented machine with a license to use the patent right. This was to run for seventeen years, which was assumed to ■be the time when the patents would expire. A British patent had been previously granted for the same improvements, and in accordance with the provisions of our patent statutes, the American patent expired at the time of the expiration of the British one. This was several years earlier than the parties had figured on in their agreement, which contained the usual clause that the licensee admitted and would not contest the validity of the patent. The ■court held that this covenant estopped the defendant from questioning the validity of the patent before the end of the seventeen years in spite of its previous expiration. Plaintiff’s counsel dismisses this casé with the simple statement that this involved a nonexclusive license and that the patent had never been declared invalid by any court. Plaintiff’s observation, however, is hardly in point as to the effect of the estoppel in view of the court’s assumption that the limitation set by the terms of the foreign patent worked “in derogation of the grant.”
To the same effect as the above cases is Thomson Spot Welder Co. v. Fairbanks Co., 37 Ga. App., 774, 141 S. E., 923.
In none of these cases is the additional language present which is a part of the license with which we are dealing that the “patents *369 shall throughout their respective terms, and for all purposes, be deemed to be in force and valid.”
Section 11 provides that the licensee shall prosecute infringers at its own expense and that it shall be responsible for judgments against the licensor in unsuccessful suits. Such provisions are indicative that there is here no covenant analogous to one of quiet enjoyment as claimed by the plaintiff, although they are not necessarily inconsistent with it. The authority given to the plaintiff in this same section to join the defendant as a complainant in infringement suits warrants the conclusion that the parties to this agreement were treating it as a license rather than as “an assignment or conveyance of a monopoly within the meaning of Chief Justice Taft’s opinion,” as contended by the plaintiff. As the Chief Justice points out it is the licensee and not the assignee of the exclusive right who must sue in the name of the licensor.
Section 12 provides that the licensee must bear the expense of defending any infringement suit brought against the licensor because of infringement by the licensee or any sub-licensee,'and must in addition pay any judgment which may be rendered either against the licensor or itself in such suit. In effect this means that the plaintiff agrees to assume all risks of operating under the patents, if it transpires that others holding superior rights under other patents have a cause of action against the parties to the agreement. The assumption of such a liability by the plaintiff is utterly inconsistent with the idea of a warranty by the defendant of the validity of the patents or of a covenant analogous to one of quiet enjoyment. Furthermore it indicates that the plaintiff accepted the rights under the various patents subject to all their defects. It would be most unlikely that the parties intended to impose a liability on the plaintiff to pay any judgment agains.t either one of them, which would necessitate an adjudication of the invalidity of the patents, and at the same time to reserve to the plaintiff a cause of action against the defendant founded on such invalidity. From the provisions of this section it is apparent that these parties contracted with their eyes open to the possibilities of trouble.
Counsel for the defendant appear to recognize the implications attached to this language, but say that it was only intended to cover the case where the plaintiff in building machines, to which in *370 accordance with the terms of the agreement would be attached the defendant’s name, should incorporate into such machines the inventions of others not covered by the patents in the license. Whether liability would attach to the licensor, if the licensee should go beyond the authority purported to be given under the license, is unnecessary for us to decide, for we must accept in its ordinary meaning the language which the parties themselves have adopted and not read, into it a limitation which could have been readily inserted if they had so desired.
The authorities seem to hold that under a license such as this and under the circumstances set forth in the plaintiff’s bill there can be no recovery by the licensee, if it turns out that the patent is invalid, and that the licensee must exercise his right in competition with others.
In Jones v. Burnham, 67 Me., 93, 99, the plaintiff granted to the defendant a license to manufacture a patented article within the State of Maine. The patent was adjudged invalid, but in a suit to recover royalties this fact was held to constitute no defense. The court cited with approval the following language from Smith v. Neale, 89 E. C. L., 67, 89: “In short, the defendant in this case contracted for the plaintiff’s right, such as it was, without regard to whether it could be sustained upon litigation or not; and there is nothing unreasonable or uncommon in such a bargain.” The Court said further, page 99: “It is well settled, that a note given in consideration of a sale of a patent, or of an interest in the same, where the patent has been adjudged void for want of novelty, cannot be enforced. In that the grantor grants a monopoly of the use of the patent; but if he has none he grants nothing. In the case of a license, the licenser grants the use of what he has and nothing more, and that without warrant. In the one case he grants a right which does not exist — in the other he grants whatever right he may have, be the same more or less.”
In Standard Button Fastening Co. v. Ellis, supra, it was held that no covenant for quiet enjoyment is implied in a license to use a patented invention.
In McKay v. Smith, supra, the court said, page 558: “A license is the grant of a right to manufacture, use, or sell the thing pat *371 ented, but, outside of the terms of the contract, I do not see that there is any implied covenant that the licensor will protect the licensee in the full enjoyment of the monopoly.”
We have been over the cases cited in the plaintiff’s briefs with great care. The industry of counsel has failed to find a single authority as a precedent to justify us in sustaining the claim of the plaintiff’s bill. Many of the cases are not in point because counsel have assumed an altogether different construction of the license agreement from that which we adopt. All cases for example holding that there is a remedy for eviction under a lease are in point only on the assumption that the licensee here was granted an exclusive right amounting to a monopoly.
We are quite willing to concede that if there is the intention to transfer an exclusive right operating on the monopoly as well as on the invention, there is in effect a purported assignment of the patent right, Robinson on Patents, Vol. II, Sec. 814, and in the absence of an estoppel, a cause of action would accrue to the licensee as soon as there should be a determination that such right did not exist. Judkins v. Earl, supra; Jones v. Burnham, supra; Dickinson v. Hall, 14 Pick., 217.
Likewise if the agreement is something less than an assignment as those words are defined by Chief Justice Taft in United States v. General Electric Co., supra, but does transfer certain exclusive rights in the invention, a right of action, in the absence of an estoppel, would accrue on the patent being held invalid, Schutte A Koerting Co. v. Wheeler Condenser & Engineering Co., supra, or perhaps as is more accurately stated on the patent being held invalid accompanied by an ouster of the licensee from such exclusive right by the lawful competition of third parties. See the language of the court in White v. Lee, 14 Fed., 789, 791; Robinson on Patents, Vol. III, Sec. 1252.
That such rights do not arise under such circumstances merely because of the exclusiveness of the grant is indicated by the fact that there may be a similar cause of action in the case of the so-called non-exclusive license where the only right given is a mere permission, if the licensee is prohibited from exercising the right attempted to be granted, because for example others hold superior *372 patents, which would be infringed by his doing so. Robinson on Patents, Vol. III, Sec. 1252; Walker on Patents (6 ed.) Vol. I, page 433; McKay v. Smith, supra, page 557.
In each of the above instances a recovery is allowed simply because the licensee does not receive that for which he bargained, but none of these is the case with which we are concerned.
The fact that the parties to this license were dealing with a large number of patents as an entirety, the covenants which show an intent to impose on the plaintiff all of the risks of operating under the patents, the plaintiff’s agreement to regard them as valid for all purposes, and the fact that it nowhere appears in the license that the defendant has not the lawful right to use the patents itself, indicate that the words used in clause 1 which omit to grant an exclusive right were used advisedly and not inadvertently. Under such circumstances we must hold that the invalidity of the three patents in question gives on the facts set forth in the bill neither a defense to the claim for royalties nor a cause of action to the licensee based on a failure of consideration. The parties are bound by their contract. It is not the province of equity to modify its terms.

Demurrer sustained. Case remanded to sitting Justice.