THE STATE OF DELAWARE, Plaintiff Below, Appellant, v. T. PAUL DABSON, Manufacturers' Casualty Insurance Company, a Pennsylvania corporation, and Seaboard Surety Company, a New York corporation, Defendants Below, Appellees. T. PAUL DABSON, Defendant and Counter-claimant Below, Appellant, v. STATE OF DELAWARE, Plaintiff Below, Appellee. THE STATE OF DELAWARE, Plaintiff Below, Appellant, v. GEORGE & LYNCH, INC. a Delaware corporation, Seaboard Surety Company, a New York corporation, and Reliance Insurance Corporation, a Pennsylvania corporation, Defendants Below, Appellees.

(*March* 2, 1966)

WOLCOTT, C.J., CAREY, J., and MARVEL, Vice Chancellor, sitting.

*Samuel R. Russell,* of Bayard, Brill, Russell & Handelman, for State of Delaware.

*William F. Lynch, II,* and *Robert M. High,* of Morris James, Hitchens & Williams,, for T. Paul Dabson et al.

*David F. Anderson* and *Richard L. McMahon,* of Berl Potter & Anderson, for George & Lynch et al.

Supreme Court of the State of Delaware, No. 78, 1965.

WOLCOTT, Chief Justice.

These are two appeals by the State from the entry of summary judgments against it upon its complaints, and a cross-appeal taken by the defendants in one of the causes from the entry of summary judgment in favor of the State upon their counterclaim. The appeals and cross-appeal were consolidated for argument and decision in this Court for the reason that they involve the same basic questions of law and grow out of similar factual situations.

Briefly, the causes grow out of a number of contracts between the State Highway Department and the two defendant contractors for the construction of roads or portions of roads. The State seeks to recover from the contractors and the bonding companies large sums of money paid out by the Highway Department for work or materials not required to be furnished under the several contracts involved, or paid out by reason of changes in the contract requirements as to unit prices for materials or changes in the quality and quantity of materials. These payments were for so-called "overruns".

The contractors defend the suits by asserting that all changes or revisions in the original contracts were requested, approved or directed by the Department's Chief Engineer, and were later approved by the Department, itself, either by resolution or by acceptance of the final work and payment therefor. In addition, one of the defendants files a counterclaim for work and material furnished but not paid for by the Highway Department.

Basically, the position of the contractors is that the changes in the contract requirements were made under the authority of the Chief Engineer, later approved by the Department, and the final acceptance and payment for the work constitutes under the contracts a release of the contractors from further liability, there being no charge of fraud or error of fact made by the State.

Basically, the State denies that the contractors have been released from liability. It argues that the Chief Engineer had no authority by law or contract to authorize any changes in work, prices or materials prescribed by the contracts. In effect, the State seeks to repudiate the acts of the Chief Engineer authorizing all the changes, and also seeks to repudiate the final approval of the Department evidenced either by formal resolution or final acceptance of the work and payment therefor.

In an earlier appeal by one of these contractors from an adverse judgment on its counterclaim, *George & Lynch, Inc. v. State, Del.,* 197 A.2d 734, we reversed the judgment entered for the State upon the counterclaim, now no longer pressed by the contractor, on the ground that the sovereign immunity of the State from suit had been waived pursuant to Article I Sec. 9 of the Constitution, *Del.C.*Ann. by the enactment by the General Assembly of 17 *Del.C.,* Sec. 132(c) 9 which authorizes the State Highway Department to enter into contracts. We pointed out in that case that the Department was empowered to enter into only vilid contracts which must necessarily have mutuality of obligation and remedy, including the right on both sides to sue the other for breach.

In the *George & Lunch* case we further pointed out that any other result would be unjust since, otherwise, the State, acting through the Highway Department, could mislead its citizens into large expenditures of money in performance of contracts and at the same time deny them the right to hold the State accountable for its breach of its contractual obligations. Such a result, we said, would be so manifestly unjust as possibly to amount to the taking of property without due process of law.

We think this decision fixes the standard of construction of the statutes authorizing the State Highway Department to enter into contracts and to supervise their performance, and also the meaning of the contracts, themselves. This standard is that there must be, as between Department and contractor, mutuality of rights, duties and remedies.

As we have pointed out, 17 *Del.C.*, Sec. 132(c) (9) authorizes the Department to enter into contracts. The contracts in question were entered into pursuant to this statute. Thereafter, by reason of 17 *Del.C.*, Sec. 158 (now repealed), performance under them was under the direction of the Chief Engineer. This section provides:

"The execution and performance of all contracts awarded by the Department shall be under the charge of the Chief Engineer, and his decision shall in all matters concerning the performance of the work and the compliance of the terms of the contract, be final."

Each of the contracts in question contained in Article Two the following provision:

"It is understood and agreed by and between the parties hereto that all construction work included in this contract is to be done under the direction of the said Chief Engineer of the Department and that his decision as to the time construction and meaning of the said proposal plans and specifications shall be final."

The contractors' bids were based upon the State Highway

Department's Standard Specifications of 1957 (except in one contract the Specifications of 1954 which are substantially similar) which were specifically made a part of each contract. By Specification 21 it was provided, *inter alia,* that the Chief Engineer could make alterations in the quantities or character of the work or materials required; by Specification 23 the Chief Engineer was authorized to order extra work or material for which no prices were provided in the contract, and by Specification 27 it was provided that the decision of the Chief Engineer upon all questions of quality and quantity of materials, the execution of the work, and the determination of payment due, shall be final and binding.

It is quite apparent that the referred-to statutes, contracts and specifications gave the Chief Engineer comprehensive powers with respect to performance under the contracts. It is also quite apparent that all the parties, the Department, the Chief Engineer and the contractors were in aggreement that the Chief Engineer's powers were broad and that he had the final word with respect to performance. We think the parties were correct in this respect for the plain effect of the cited provisions is to confer that power upon him.

The State argues, however, that if this be true, then the details of the contracts entered into become meaningless since they can be altered at will by the action of the Chief Engineer. In a sense, this may be true, but we point out that the details of the contracts are binding on the contractors unless they are altered by the Chief Engineer, and that the contractors are powerless to compel such an alteration. Furthermore, this must have been intended since the contracts, themselves, authorize alterations in the specifications when circumstances make such alterations desirable.

If the State's contention in this respect were followed, it would result in the elimination from the agreement of some of the provisions on the basis of which the contracts were entered into. This cannot be since we are bound to give effect to all the provisions of an agreement which are not contrary to law, and none of these are contended to be contrary to law.

 The most the State argues is that the Chief Engineer acted beyond the scope of his authority. We think, however, that his actions were within the scope of the authority conferred upon him. The State's argument, upon analysis, would seem to be that as a matter of good administrative policy the Chief Engineer's power was too untrammeled. With respect to the wisdom of a course of action, however, we have nothing to do. Such decisions are to be made by a branch of the government other than the judicial. If the policy does not run afoul of some legal inhibition, it will be upheld by the courts.

 Furthermore, all of the action taken by the Chief Engineer resulting in the so-called overruns was later approved formally by the Department or finally accepted and paid for. The present causes are in reality, therefore, an attempt by the State to repudiate the action of its Highway Department and its Chief Engineer and to hold the contractors liable for something which, under their agreements, they were required to do. This, we think, cannot be allowed under the concept of fairness referred to in the George & Lynch decision.

Under the facts before us, it is apparent that the State's representative permitted, and indeed encouraged, the contractors to deliver materials and perform work on public property in a manner suitable to the State. If, at this late date, the State may now repudiate the action of its employees and hold the contractors responsible for that which they had no option but to perform, the result will be to give the State a merciless and unconscionable advantage over them. See State ex rel. *Washington Pav. Co. v. Clausen,* 90 Wash. 450, 156 P. 554, L.R.A.1917A, 436; *David J. Joseph Co. v. United States,* 82 F.Supp. 345, 113 Ct.Cl. 3; *Standard Transformer Co. v. City of Detroit, D.C.,* 146 F.Supp. 740, and *Louisiana v. McIlhenny,* 201 La.78, 9 So.2d 467, 142 A.L.R. 533. We think the circumstances work an estoppel against the State to assert these claims.

 The State relies on Article Four of the Contracts and Specification 56 in opposition to the raising of an estoppel against it. These, however, provide that the State shall not be estopped by a certificate of performance or payment by it from recovering damages

for the failure of a contractor to live up to the standards required by the contract and specifications. Necessarily, this includes changes in the specifications properly authorized. There is no charge here that substandard material was furnished, or improper work performed. We think, therefore, that Article Four and Specification 56 have no pertinency in this case. Even if they were applicable, there must be a period of time after which the State could make no claim. That time has now passed.

Finally, Specification 75 and 67 seem to us to be a complete answer to the State's contentions. Specification 75 provides that as soon as possible after completion of the contract, the Chief Engineer shall make a final net estimate of the amount due the contractor on the contract which should be paid by the Department. If the contractor accepts the last payment, the State is then released from any further liability. Similarly, Specification 67 provides that when the final estimate is paid and accepted, the contractor is released from further liability except for proof of error as set forth in the contract bond.

In these cases the final estimates were made by the Chief Engineer, approved by the Department and accepted by the contractor. We think this action released everyone from further liability in the absence of a showing of fraud. Thus, the State may not maintain these actions since it has released the defendants from further liability under the contracts. Similarly, the contractors may not maintain their counterclaims since they likewise have released the State from further liability under the contracts.

The judgments below are affirmed.