**INTERPETROL BERMUDA, LTD., Plaintiff,**

v.

**LLOYD'S UNDERWRITERS and Institute of London Underwriters, Defendants.**

**No. 83 Civ. 3941 (EW).**

United States District Court, S.D. New York.

June 22, 1984.

**1200**

Walker & Corsa, New York City, for plaintiff; William G. Mead, Jon W. Zinke, New York City, of counsel.

Donovan, Maloof, Walsh & Kennedy, New York City, for defendant underwriters; John T. Lillis, Jr., David R. Hornig, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff Interpetrol Bermuda, Ltd. ("Interpetrol"), commenced this action against Lloyd's Underwriters and Institute of London Underwriters (collectively, "Lloyd's" or defendants), seeking to recover in excess of $2.5 million on a marine cargo insurance policy.[1] Defendants move for summary judgment dismissing plaintiff's claims.

On June 1, 1980, plaintiff and Lloyd's entered into a "permanent open cover" policy of "all risk" insurance whereby Interpetrol was insured up to $75 million for damage to crude oil or oil products cargos under specified conditions. The risks insured against were specified in the contract as those stated in the standard form "Bulk Oil Clauses," as amended by the parties. In particular, Bulk Oil Clause 7 provides coverage "[a]gainst all risks whatsoever (excepting as hereinafter provided) [.]"[2] This language was amended by the parties "to read":

> To pay average &/or [c]ontamination irrespective of percentage including leakage or shortage from any cause in excess of ½% of whole shipment and if not measured off by independent supervision excess increased to 1% whole shipment.

In addition, Bulk Oil Clause 8 provides:

> This insurance is also specially to cover any loss of and/or damage to the interest insured hereunder, including shortage and/or leakage and/or contamination, through the bursting of boilers, breakage of shafts or ... from faults or errors in the navigation and/or management of the vessel by the Master, Mariners, Mates, Engineers or Pilots; provided, however, that this clause shall not be construed as covering loss arising out of delay, deterioration, or loss of market,

---

1. Admiralty jurisdiction is properly asserted in an action to enforce a contract for marine insurance. *See CTI-Container Leasing Corp. v. Oceanic Operations Corp.,* 682 F.2d 377, 380 n. 4 (2d Cir.1982).

2. The remainder of the clause provides that Lloyd's is not liable for "contamination ... un-

less caused by or arising out of the vessel or craft being stranded, sunk, burnt, in collision or contact with any substance ... or there be a forced discharge of cargo." It is not necessary, on this motion, to determine the effect of this language, or the parties' amendment to it, on plaintiff's right to recover.

unless otherwise provided elsewhere in this policy.

While the policy was in force, Interpetrol, on January 7, 1981, executed a certificate of insurance bringing under the "cover" outlined above a shipment of 73,029.72 metric tons of "unsold"[3] "B–962 fuel oil" valued at $16,397,537.00 to be carried aboard the M.T. Norseman from Bahrain, in the Persian Gulf, to Le Verdon, France. For the limited purposes of the instant motion, Lloyd's concedes that, when loaded aboard the Norseman at Bahrain on about February 8–10, 1981,[4] the oil was in sound condition and met all commercial specifications for B–962 fuel oil.

Plaintiff's essential claim is that during the course of the voyage, on about February 17, 1981, the cargo of fuel oil became contaminated insofar as its "flashpoint" had fallen below recognized international petroleum industry minimum standards.[5] Plaintiff concedes that this contamination was only temporary, and that by March 4, 1981, it had been corrected, since, when the vessel arrived at Cape Town, South Africa, and the cargo was tested, and at all other points during the voyage when the cargo was sampled, the oil met or exceeded the relevant specifications.[6] The oil was sold on about May 7, 1981, while the vessel was en route, and the cargo was discharged upon timely arrival at Le Verdon, France, on about May 19, 1981, in good order and condition. Interpetrol asserts, however, that it sustained damages because of the temporary contamination in that during the

period from the discovery of the flashpoint deficiency to the time of its cure, that is, from about February 17 to March 4, 1981 ("the delay period"), the cargo was not marketable because Interpetrol could not guarantee to the trade conformity with the minimum flashpoint specifications; that the flashpoint contamination thus caused the cargo to be "restrained, sequestered and unavailable for trading as B–962 [f]uel [o]il"; that even after the delay period the cargo could not be sold because petroleum product traders throughout the world refused to purchase the oil, which had acquired a reputation of "rogue cargo"; and that between the time the oil first became contaminated and the time it was sold in early May 1981 the world market for B–962 fuel oil experienced a drastic decline, and, in consequence, Interpetrol was forced to sell the fuel oil at a price far below that which it had paid for the oil in Bahrain.[7]

For the purposes of this motion, Lloyd's does not take issue with the foregoing series of allegations stated in the immediately preceeding paragraph hereof. Rather, it contends that the policy of insurance does not cover Interpetrol's "market loss" so long as the cargo was delivered, as it was, on time, free of contamination, and otherwise in good order and condition. In sum, Lloyd's asserts that a temporary condition of contamination that occurs during the voyage but is corrected prior to and by the time of delivery of the cargo at the port of destination is not an insured risk under the "all risk" policy. Interpetrol asserts that

---

3. Petroleum products cargos unsold by Interpetrol at the time of shipment were to be valued, for purposes of any future claims, at "amount insured declared by [a]ssured prior to known or reported loss ...." The contract permitted Interpetrol to increase the valuation of oil cargos sold by plaintiff while at risk and prior to known or reported loss to the price at which Interpetrol had sold them. Upon the argument, Lloyd's conceded that it was customary in the industry that oil be sold while en route from the Persian Gulf region.

4. Because the Norseman could not berth near the oil tanks onshore at Bahrain, the oil was first loaded onto a smaller vessel, the Kodiak, and then transferred to the Norseman.

5. Oil below such minimum standards cannot be stored onshore because of the likelihood that such oil will spontaneously explode.

6. Plaintiff's former general manager testified at his deposition that the contamination was cured by actions of the ship's crew in opening the ullage holes, which allows vapors lying above the fuel oil that were suppressing the flashpoint to evaporate. *See* Dep. of Henri Lehner 165, 168.

7. Interpetrol claims damages not only for the loss of market but also for the cost of financing the cargo from the beginning of the delay period to the time of sale.

the amended clauses of the insurance contract, quoted above, entitle it to recovery for all damages proximately caused by a temporary contamination, even though the cargo was timely delivered in good order and condition.

## DISCUSSION

■ Interpetrol resists the motion for summary judgment upon the ground that it has "propound[ed] a reasonable conflicting interpretation of a material disputed fact."[8] In an action to enforce a contract of marine insurance, the central material fact is the parties' " 'reasonable understanding ... as to the meaning of their insurance agreements.' "[9] Thus, although the precise issue here—whether a temporary contamination of cargo that deprives the cargo owner of free access to the market is ground for recovery under an "all-risk" insurance policy—appears to be a question of first impression, it must be resolved by application of traditional contract law.

In support of its motion, Lloyd's relies principally on those cases which hold that in actions to recover upon a contract of marine insurance the insured must carry "the burden of showing that the cargo was in good order and condition when the policy attached, and that the cargo was damaged when unloaded from the vessel."[10] Lloyd's contends that since it is conceded that the cargo was delivered in good order and condition at Le Verdon, France, Interpetrol is barred from recovery. This argument misconceives the nature of plaintiff's position and begs the question presented by its claim. To be sure, plaintiff concedes that the cargo was not contaminated upon its outturn at Le Verdon. However, relying on the Bulk Oil Clauses, as amended, quoted above, it contends that the temporary contamination was an insured peril under the policy. Under Bulk Oil Clause 7, Interpetrol was covered "[a]gainst all risks whatsoever (excepting as hereinafter provided)[.]"[11] By amendment the parties agreed that Lloyd's would "pay ... [c]ontamination ... from any cause." This language, upon its face, appears to support plaintiff's claim of coverage. In addition, Interpetrol emphasizes that the policy does not include a "general delay clause" that would clearly indicate that damage sustained by loss of market, under the instant circumstances, was not an insured risk.[12]

■ To overcome plaintiff's position, Lloyd's relies upon the proviso contained in Bulk Oil Clause 8, the "Inchmaree Clause,"[13] which states: "[T]his clause shall not be construed as covering loss arising out of delay, deterioration or loss of market, unless otherwise provided in this policy." Interpetrol, however, argues that the clause, "unless otherwise provided in this policy[,]" leaves the language of Bulk Oil Clause 7, as amended, upon which Interpetrol relies, free of the exclusionary effect of the proviso to Bulk Oil Clause 8. This interpretation is lent force by the language of the proviso that appears to limit the proviso's exclusionary effect to "this clause," that is, Bulk Oil Clause 8. It is not necessary, on this motion, to determine whether plaintiff's or defendants' interpretation of the policy language governs the instant dispute. It is evident, no matter whose version of the contract ultimately prevails, that the contractual language is

**8.** *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9 (2d Cir.1983).

**9.** *Antilles S.S. Co. v. Members of the Am. Hull Ins. Syndicate,* 733 F.2d 195, 199 (2d Cir.1984) (quoting *Blaine Richards & Co. v. Marine Indem. Ins. Co.,* 635 F.2d 1051, 1054 (2d Cir.1980)); *see* G. Gilmore & C. Black, *The Law of Admiralty* § 2–3, at 56 (2d ed. 1975).

**10.** *Morrison Grain Co. v. Utica Mut. Ins. Co.,* 632 F.2d 424, 432 (5th Cir.1980); *see Banco Nacional*

*de Nicaragua v. Argonaut Ins. Co.,* 681 F.2d 1337, 1340 (11th Cir.1982).

**11.** *See supra* note 2.

**12.** *See Blaine Richards & Co. v. Marine Indem. Ins. Co.,* 635 F.2d 1051, 1052 (2d Cir.1980) (quoting language of insurance contract).

**13.** *See Antilles S.S. Co. v. Members of the Am. Hull Ins. Syndicate,* 733 F.2d 195, 198–199 (2d Cir.1984).

ambiguous.[14] And, although "strictly economic losses, like lost profits, loss of the anticipated benefit of a bargain, [or] loss of an investment ... do not constitute damage or injury to tangible property covered by a comprehensive general liability policy,"[15] this general rule does not apply to claims under an all risk policy for damage directly flowing from an insured peril.[16] Under an "all risk" policy, economic damage proximately caused by an insured peril will be deemed "not consequential."[17] Thus, it is plain that genuine issues of material fact exist concerning the scope and effect of the parties' contract of insurance. Under Rule 56, these must be resolved upon a trial.

The motion for summary judgment is therefore denied.

So ordered.

---

**14.** Upon a trial Lloyd's would be entitled to submit evidence indicating that coverage was not intended, for the doctrine of contra proferentem "is used only as a matter of last resort, after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument." *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 10 n. 2 (2d Cir.1983). No such extrinsic evidence, however, was presented to the Court on the instant motion, and the Court must, in assessing that which has been presented, "'resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought[.]'" *Beacon Enters. Inc. v. Menzies,* 715 F.2d 757, 762 (2d Cir.1983) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir.1975)). Moreover, under "all risk" insurance policies, "all losses attributable to external causes are covered, absent specific exclusion thereof." *Northwestern Mut. Life Ins. Co. v. Linard,* 498 F.2d 556, 561 (2d Cir.1974); *accord, Atlantic Lines Ltd. v. American Motorists Ins. Co.,* 547 F.2d 11, 12 (2d Cir.1976); *Holiday Inns Inc. v. Aetna Ins. Co.,* 571 F.Supp. 1460, 1463 (S.D.N.Y.1983). An exclusionary term will be considered ambiguous if it is reasonably capable of a construction favorable to the insured.

*Pan Am World Airways v. Aetna Casualty & Sur. Co.,* 505 F.2d 989, 999–1000 (2d Cir.1974).

**15.** *Triple U Enters., Inc. v. New Hampshire Ins. Co.,* 576 F.Supp. 798, 806 (D.S.D.1983); *see* 4 Appleman, *Insurance Law and Practice* § 2329, at 323 (1969).

**16.** *Stanley v. Onetta Boat Works, Inc.,* 303 F.Supp. 99, 106 (D.Or.1969), *aff'd,* 431 F.2d 241 (9th Cir.1970). To prevail upon a trial, Interpetrol must still overcome the requirement that the loss be proximately caused by an insured peril. *See Ope Shipping, Ltd. v. Allstate Ins. Co.,* 687 F.2d 639, 641 (2d Cir.1982); *Blaine Richards & Co. v. Marine Indem. Ins. Co.,* 635 F.2d 1051, 1054 (2d Cir.1980); *see generally Lanasa Fruit S.S. & Importing Co. v. Universal Ins. Co.,* 302 U.S. 556, 562, 58 S.Ct. 371, 373, 82 L.Ed. 422 (1938).

**17.** *Stanley v. Onetta Boat Works, Inc.,* 303 F.Supp. at 106.

Lloyd's makes no claim on this motion that the loss was not "fortuitous." *See Atlantic Lines Ltd. v. American Motorists Ins. Co.,* 547 F.2d 11, 12 (2d Cir.1976); *Mellon v. Federal Ins. Co.,* 14 F.2d 997, 1004 (S.D.N.Y.1926).