**E.I. du PONT de NEMOURS AND COMPANY, INCORPORATED, Plaintiff Below, Appellant,**

v.

**SHELL OIL COMPANY, Defendant Below, Appellee.**

Supreme Court of Delaware.

Submitted: Feb. 5, 1985.

Decided: Aug. 21, 1985.

Richard L. Sutton (argued) and Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell, Wilmington, for appellant.

E. Norman Veasey (argued), Allen M. Terrell, Jr., Stephen E. Herrmann, and John J. Schreppler, II, Richards, Layton & Finger, Wilmington, for appellee.

Before McNEILLY and HORSEY, JJ., O'HARA, BIFFERATO and TAYLOR, Judges, constituting the Court en Banc.

HORSEY, Justice:

This appeal requires us to determine the limits of a licensee's right to manufacture and sell a product under grant of a nonexclusive license without right to sublicense. The license agreement expressly prohibited the licensee from sublicensing. It did permit the licensee to make the patented product or to "have [it] made" and to sell the product. We here consider whether a nonexclusive license agreement entered into between E.I. duPont de Nemours and Company, Inc. ("DuPont") and Shell Oil Company ("Shell") in 1968 bars licensee Shell from carrying out a 1981 arrangement made between Shell and a wholly-owned subsidiary of Union Carbide Company, Inc., Union Carbide Agricultural Corporation, Inc. ("Carbide"). Under the arrangement, Carbide would manufacture the patented product for sale in a quantity to meet Carbide's requirements and Shell bound itself to sell the same quantity to Carbide.

Plaintiff DuPont appeals from the Court of Chancery's grant of a partial final declaratory judgment in favor of defendant Shell. That Court construed Shell's arrangement with Carbide as permissible under the "have made" language of DuPont's 1968 Patent License Agreement ("the License Agreement"), even in light of the License Agreement's prohibition against Shell's grant of a sublicense. We cannot agree with the Vice Chancellor's construction of the Agreement; and, for the reasons which follow, we reach the contrary conclusion. We conclude that Shell's contractual arrangements with Carbide consti-

tute, in essence, a sublicense. Accordingly, we reverse the Court of Chancery's finding to the contrary and direct entry of partial judgment for DuPont.

## I.

In the 1960's, both DuPont and overseas affiliates of Shell[1] independently developed the insecticide, methomyl. DuPont and SIRM filed patent applications on methomyl in various jurisdictions throughout the world. By 1967, it was apparent that DuPont had obtained the dominant patent position for methomyl in the United States, while Shell had obtained such position in most of the commercially important countries overseas.

DuPont's interest in a potential Australian market prompted negotiations with Shell concerning a possible cross-licensing agreement. Negotiations continued through the fall of 1967, and in 1968, Shell and DuPont executed a Patent License Agreement with reciprocal provisions. Shell and its affiliates granted DuPont a license to commercially exploit methomyl in foreign countries where SIRM held the patents. The reciprocal provision, at the heart of this litigation, gave Shell equivalent rights with respect to the marketing of methomyl in the United States. It provided:

> DuPont grants to Shell a nonexclusive license, without the right to sublicense, to become effective January 1, 1973, to make, have made, use and sell for use and resale METHOMYL and T-1642 [another chemical] and their formulations under the DU PONT PATENT RIGHTS.

Several years later during the 1970's, Carbide developed a product called Larvin, an insecticide which uses methomyl as an intermediate in its formulation. Therefore, in 1978, Carbide sought a ready supply of methomyl.

---

1. Shell Internationale Research Maatschappij, N.V. and Shell International Chemical Company (hereinafter collectively referred to as "SIRM") constitute service companies wholly owned by the Royal Dutch-Shell Group, an international enterprise which owns the majority of outstanding stock in Shell.

Carbide first requested a license to manufacture methomyl from Shell. Shell informed Carbide that it did not have the right to sublicense the manufacture of methomyl pursuant to its License Agreement with DuPont. Shell advised Carbide that only DuPont could grant a license for the domestic manufacture of methomyl.

As an alternative, Carbide investigated the possibility of buying from Shell quantities of methomyl sufficient to fill its needs. However, Carbide learned that the Shell plant, located near Denver, Colorado, did not have the necessary capacity to produce what Carbide required. In fact, the Denver plant had difficulty even in satisfying Shell's own needs for methomyl which it used to formulate another Shell product, Nudrin.

Shell then proposed the following arrangement: (1) Carbide would manufacture methomyl for Shell under the "have made" provision of its License Agreement with DuPont; and (2) exercising its right to "sell for use or resale," Shell would immediately sell the methomyl back to Carbide using a separate purchase and sale agreement. Carbide initially rejected the proposal.

Instead, Carbide approached DuPont directly seeking a license for the manufacture and use of methomyl. In addition to being able to make methomyl for its own use, Carbide saw another advantage to obtaining a license. Assuming a license were granted, Carbide anticipated tremendous economies of scale in the manufacture of methomyl at its plant, provided that it were also able to supply Shell with methomyl for its use and for sale to third parties.

Therefore, in May 1979, Carbide prepared two preliminary proposals. First, Carbide proposed that DuPont license Carbide to manufacture methomyl for its use in Larvin in return for Carbide's grant of a license to DuPont to sell Larvin. Second, believing that such license would be forth-

coming, Carbide proposed to supply Shell with methomyl for sale to third parties.

DuPont rejected Carbide's proposal, because it had no interest in marketing Larvin. However, DuPont did offer to sell methomyl to Carbide at a favorable price for limited use in the formulation of Larvin. Carbide rejected this counteroffer.

Carbide then immediately contacted Shell about its earlier suggestion that Carbide manufacture methomyl for Shell and then buy it back from Shell. Shell and Carbide entered into a Methomyl Toll Conversion Agreement[2] and a Methomyl Purchase and Sale Agreement. The Agreements were negotiated, drafted and executed simultaneously. Both Agreements cover the same period of time, terminating in 1988 when DuPont's methomyl patent expires. Moreover, termination of the Toll Conversion Agreement terminates the Purchase and Sale Agreement.

In essence, the Agreements provided that Carbide would produce methomyl for Shell's account, simultaneously buying back from Shell some or all of the methomyl Carbide manufactured. More specifically, the Agreements operated in tandem as follows:

Carbide was to construct a plant to manufacture 18 million pounds of methomyl per year. Carbide would then order from Shell the amount of methomyl it required. Shell would convey such information back to Carbide so that it could manufacture the required amounts. Carbide would send Shell a delivery schedule, with Shell relaying that information back to Carbide. Carbide would then place the methomyl in its own containers, simultaneously effectuating both delivery to Shell and redelivery to Carbide. Title was to remain in Shell until redelivery to Carbide. Carbide was to bear the risk of loss until delivery to Shell. Shell was obligated to sell to Carbide all of the methomyl which Carbide required both for use in making Larvin and for export

2. Under a toll conversion agreement, one company receives a fee to manufacture a product

for another company.

sales. However, Shell was not obligated to sell unless Carbide performed its obligations under the Toll Conversion Agreement. Nor was Shell obligated to have any methomyl made in addition to that ordered by Carbide.

The drafters of these Agreements felt that the "have made" and "sale for use or resale" language of the DuPont License Agreement permitted the Toll Conversion and Purchase and Sale Agreements between Shell and Carbide. However, they were concerned by the License Agreement's express prohibition against sublicensing. Therefore, as the notes of one of Shell's lawyers reveal, counsel for Shell carefully structured the transaction so that, technically, it would not take the form of a license. Anticipating that DuPont would take legal action upon learning of the manufacture/sale-back arrangement, Shell's counsel noted:

> To me it is essential that [the] transaction be structured to withstand scrutiny of a court. Must be a good faith exercise of our rights to "have made" and "sell back."

> \*　　\*　　\*　　\*　　\*　　\*

> The use of a separate toll conversion agreement and sales agreement is not merely "cosmetic." Each agreement should be able to stand on its own, i.e., one agreement is between Shell and Carbide as toll manufacturer, and the other between Shell and Carbide as a customer for methomyl.

And, in response to Carbide's suggestion that Shell establish different conversion fees for the methomyl eventually sold back to Carbide, as opposed to that sold to Shell's other customers, counsel continued:

> Can't justify different toll conversion schedules for product we would keep and that we would sell back to Carbide. Inconsistent with our basic position. Therefore, we are recalculating Carbide's toll conversion fees and sell back price so as to have only one toll conversion fee schedule but still keep same approximate

dollar value as proposal made to us by [Carbide].

DuPont responded as predicted. It filed an action in the Court of Chancery for a declaratory judgment that the prohibition on sublicensing in the 1968 License Agreement barred the toll manufacture/sale-back arrangement between Shell and Carbide. In an unreported Letter Opinion, the Vice Chancellor found that such arrangement fell within the scope of Shell's collective rights: (a) to have methomyl made for Shell by a third-party manufacturer (Carbide); and (b) to sell methomyl to a third party (Carbide) for its own use or for resale. Therefore, the Vice Chancellor concluded that the Shell-Carbide arrangement did not violate the DuPont's 1968 License Agreement with Shell. In support of this conclusion, the Vice Chancellor reasoned:

> As a matter of fact, the License Agreement contains no language which could be construed as restricting Shell's right to sell methomyl or to have it made.

> \*　　\*　　\*　　\*　　\*　　\*

> To contend now that the prohibition against a sublicense is a restriction against Shell selling methomyl to its toll converter engrafts a restriction on Shell's otherwise unrestricted right to "sell." But nowhere in the negotiations or in the document itself is there to be found a restriction on Shell's right to sell.

The Court also concluded that the Shell-Carbide arrangement did not constitute a sublicense. While the Court acknowledged that Carbide "is getting all the methomyl it needs" or "desires," it concluded that the 1981 arrangement did not constitute a sublicense because Carbide's acquired rights did not include either the right to sell methomyl in the United States or the right to have third parties make methomyl for Carbide.

## II.

▮▮ The question presented—whether the Shell-Carbide Toll Conversion Agreement coupled with the Purchase and Sale

Agreement is prohibited by the DuPont-Shell License Agreement—is apparently one of first impression in this country. It also involves a mixed question of fact and law. While this Court must accept findings of fact of the Court of Chancery, which are supported by the record, we are not bound to accept inferences and deductions which are either not supported by the record or are not the product of an orderly and logical deductive reasoning process. *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671 (1972). *See also New York Trust Co. v. Riley,* Del.Supr., 16 A.2d 772, 783 (1940).[3] The dispute here is not over the facts, but rather, over the inferences and deductions to be drawn therefrom.

The question we must address is really one of construction and the application of law to the facts. Over such matters, we have plenary review. While we agree with the Vice Chancellor that the combination of the "have made" and "sell" rights would ordinarily sanction the toll conversion/sale-back arrangement, such conclusion cannot stand in the face of the License Agreement's explicit prohibition on sublicensing.

## A

In determining the scope of the "have made" rights under the License Agreement, we first must consider whether the prohibition against sublicensing in any way restricts those rights.

In so doing, we look to certain fundamental rules of contract construction, which apply equally to the construction of patent licenses. *4–One Box Machine Makers v. Wirebounds Patents Co.,* Me.Supr., 131 Me. 356, 163 A. 167 (1932); *accord Gronemeyer v. Hunter Manufacturing Corp.,* Del.Ch., 106 A.2d 519 (1954). The

basic rule of contract construction gives priority to the intention of the parties. *Radio Corp. of America v. Philadelphia Storage Battery Co.,* Del.Supr., 6 A.2d 329 (1939). *See also Pennwalt Corp. v. Plough, Inc.,* 3rd Cir., 676 F.2d 77, 80 (1982); *DuPont v. Wilmington Trust Co.,* Del.Ch., 45 A.2d 510 (1946); *Restatement (Second) Of Contracts* § 202. In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein. *State v. Dabson,* Del.Supr., 217 A.2d 497 (1966); *Bamdad Mechanic Co. v. United Technologies Corp.,* D.Del., 586 F.Supp. 551 (1984). Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan. *Stemerman v. Ackerman,* Del.Ch., 184 A.2d 28, 34 (1962). *See also Bamdad Mechanic Co., supra* at 555; *Faw, Casson & Co. v. Cranston,* Del.Ch., 375 A.2d 463, 466 (1977).

As the Vice Chancellor noted below, it is clear that DuPont and Shell intended that the License Agreement permit Shell to have a third party make unlimited quantities of methomyl for Shell's benefit. Moreover, the parties did intend to give Shell the right to sell unlimited quantities of methomyl. However, we disagree with the Vice Chancellor that the parties did not intend to restrict the "have made" and "sell" rights in any way.

The parties included a specific provision to prevent Shell from sublicensing the right to make and sell methomyl. The intended importance of this prohibition is underscored by the fact that even if a prohibition had not been written in the agreement, Shell would not have been permitted by operation of law to issue a subli-

---

**3.** Therein, Chief Justice Layton stated:

The ultimate fact in issue is domicile. This is a question of law based on facts. The so-called finding of fact is a deduction, a process of reasoning or logical inference. In such case the reviewing court is as competent to judge of the correctness of the conclusion

as is the lower court. *In re Dorrance,* 309 Pa. 151, 163 A. 303. As an appeal is a review of both law and fact, it is the duty of this court, in the instant circumstances, to draw its own inferences and to reach its own conclusions. 16 A.2d at 783.

cense. In fact, Shell itself concedes that a nonexclusive patent license carries with it an implied prohibition on sublicensing. *See Providence Rubber Co. v. Goodyear,* 76 U.S. 788, 799, 19 L.Ed. 566 (1869); *Rock-Ola Mfg. Corp. v. Filben Mfg. Co.,* 8th Cir., 168 F.2d 919, 922, *cert. dismissed,* 335 U.S. 855, 69 S.Ct. 134, 93 L.Ed. 403 (1948); Walker on Patents § 408 (Deller ed. 1965). Therefore, reading the "have made" and "sell" rights together with the prohibition on sublicensing, we conclude that the prohibition against Shell's grant of a sublicense under the License Agreement affirmatively acts to restrict Shell's otherwise unfettered ability to "have [methomyl] made" and to sell it.

 To hold otherwise would be to permit an inference arising from the "have made" and "sell" rights to negate the overall scheme of a nonexclusive patent license. *See Stemerman v. Ackerman, supra.* A nonexclusive patent license conveys certain indivisible rights under the patent, which are personal to the licensee. As such, these rights are not susceptible to sublicensing, unless specific permission is given. *Unarco Industries, Inc. v. Kelley Co.,* 7th Cir., 465 F.2d 1303, 1306 (1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 590 (1973). No such permission was given here.

 Moreover, were we to find that the prohibition against sublicensing did not limit Shell's "have made" and "sell" rights, we would in effect be reading such prohibition out of the License Agreement. To do so would be to violate the cardinal rule of contract construction that, where possible, a court should give effect to all contract provisions. *State v. Dabson, supra; Bamdad Mechanic Co., supra.*

 And, unlike the Court below, we find that the rule of contra proferentum has no application here. In finding that Shell had an unrestricted right to "have made" and to "sell," the Vice Chancellor stated that the provision prohibiting sublicensing must be construed against the

drafter, DuPont. We disagree with that approach. First, we note that the rule of contra proferentum is one of last resort, such that a court will not apply it if a problem in construction can be resolved by applying more favored rules of construction. *Schering Corp. v. Home Ins. Co.,* 2d Cir., 712 F.2d 4 (1983); *Saturn Oil & Gas Co. v. Northern Natural Gas Co.,* 8th Cir., 359 F.2d 297 (1966); *Interpetrol Bermuda, Ltd. v. Lloyd's Underwriters,* S.D.N.Y., 588 F.Supp. 1199 (1984). Moreover, the justification for applying such rule pales in a situation, like the instant one, where the terms of an agreement resulted from a series of negotiations between experienced drafters. *Spatz v. Nascone,* W.D.Pa., 368 F.Supp. 352, 354 (1973). Where all parties to a contract are knowledgeable, there is no reason for imposing sanctions against the party who drafted the final provision.

Therefore, we conclude that the prohibition against sublicensing does limit Shell's rights to "have [methomyl] made" and to "sell [it to a third party] for use or resale."

### B

We next consider whether the toll conversion/sale-back arrangement between Shell and Carbide, in effect, amounted to a "sublicense." In our view, such arrangement did constitute a sublicense in violation of the License Agreement.

\* \* \*

In this case, we are dealing with what first appears to be two independent contracts. Indeed, were each contract to be considered in a vacuum, each would constitute a permissible exercise of Shell's rights under the License Agreement to enter into contracts to 1) have methomyl made and 2) to sell such methomyl for use or resale. However, because of the manner in which the parties entered into the Toll Conversion Agreement and the Purchase and Sale Agreement, it is obvious that these Agreements cannot be considered apart from one another and must be read together as two parts of the same business transaction.

■ The specific provisions of these Agreements and the interrelationship thereof make it clear that the parties intended these two Agreements to operate as two halves of the same business transaction. Both Agreements were entered into on the same date and cover the same period of time. Shell's obligations under the Toll Conversion Agreement are contingent upon Carbide's performance under the Purchase and Sale Agreement. Thus, the minimum quantities of methomyl which Carbide must make for Shell under the Toll Conversion Agreement and which Carbide must then buy back from Shell under the Purchase and Sale Agreement are identical. Further, the two agreements work in tandem with respect to ordering, delivery and payment. Where two agreements are executed on the same day and are coordinated to the degree outlined above, in essence, they form one contract and must be examined as such. *Von Lange v. Morrison-Knudsen Co.*, M.D.Pa., 460 F.Supp. 643 (1978), *aff'd*, 609 F.2d 504 (3rd Cir.1979). *See also Lowell v. Twin Disc, Inc.*, 2d Cir., 527 F.2d 767, 769–70 (1975); *Stern & Co. v. State Loan & Finance Corp.*, D.Del., 238 F.Supp. 901 (1965).

\* \* \*

Given that the two Agreements in question comprise parts of the same business transaction, we now address the crucial issue: Do the two Agreements, the Toll Conversion Agreement and the Purchase and Sale Agreement, equal a sublicense? We find that they do.

■ In considering this question, we note that it is the overall effect of such Agreements, rather than their precise label, which will determine whether such an arrangement amounts to a sublicense. *Waterman v. Mackenzie*, 138 U.S. 252, 256, 11 S.Ct. 334, 335, 31 L.Ed. 923 (1891); *Lindenberg v. First Federal Savings & Loan*, 11th Cir., 691 F.2d 974, 976 (1982).

In *Carey v. United States*, Ct.Cl., 326 F.2d 975, 164 Ct.Cl. 304, (1964), the Court of Claims looked to the substance of various agreements in differentiating the exercise of "have made" rights from the grant of a sublicense. In *Carey*, the United States had an exclusive license, including a right to sublicense, for a patented process used to produce titanium. The United States entered into a series of agreements that permitted certain producers to avail themselves of the patented process to manufacture titanium. The United States claimed to be exercising its rights to grant sublicenses, which entitled it to share royalties with the licensor. The licensor, however, claimed that the United States was only exercising its "have made" rights under the license, and that therefore, the licensors were entitled to all of the royalties. In resolving this dispute, the Court distinguished "have made" rights from sublicenses:

A licensee having the right to produce, use and sell might be interested only in using the article or in selling it; in order to use it or sell it, the article must be produced; to have it produced, his license permits him to engage others to do all the work connected with the production of the article for him. Production of the article for the use of the licensee is production under the license.

Not so under a sublicense, unless the sublicensee is producing for the original licensee. To produce for his own use or for the use of someone else, the sublicensee may do so only under a sublicense. So the test is, whether the production is by or for the use of the original licensee or for the sublicensee himself or for someone else.

*Carey v. United States*, 326 F.2d at 979–980. *See also Southwire Co. v. United States International Trade Commission*, C.C.P.A., 629 F.2d 1332, 67 C.C.P.A. 141 (1980). In *Carey*, the Court of Claims found that in making the agreements, the United States was exercising its rights to make, use and sell under the license, because all titanium production inured to its benefit as the original licensee.

■ Applying the rule of *Carey* to the instant case, we find that the Toll Conver-

sion and Purchase and Sale Agreements did amount to a sublicense because, ultimately, Carbide was producing methomyl, not for Shell, but rather for itself. The minimum amount of methomyl which Carbide was obligated to produce under the Toll Conversion Agreement was the same minimum amount of methomyl which Carbide was obligated to buy back from Shell under the Purchase and Sale Agreement. What we have here is a situation wherein Shell is assuming the posture of a middleman solely to by-pass the prohibition against sublicensing by virtue of some neatly tailored drafting. We cannot countenance such legerdemain whereby Shell sought to free itself from the contract language by which it agreed to be bound under the License Agreement with DuPont. *See Francklyn v. Guilford Packing Co.,* 9th Cir., 695 F.2d 1158 (1983) (A sale/leaseback arrangement cannot be used to exploit a "shop right" under a patent, which would be otherwise unassignable.)

 Instead of applying the rule in *Carey,* the Court of Chancery looked to certain "indicia" of licenses, such as custody, control and title, to determine whether Carbide was a sublicensee. To be sure, these rights are relevant, but only insofar as one compares Carbide's rights under the two Agreements with Shell's rights under the License Agreement, vis-a-vis the ultimate rights of DuPont as patentee. The question of defining a license or sublicense is not a matter of measuring such an arrangement against hard and fast indicia of licenses, but rather, it is a matter of determining the relative rights of the parties.

 In considering whether such Agreements constituted a sublicense, the Court of Chancery found significant the fact that the Purchase and Sale Agreement prohibited Carbide from selling methomyl in the United States. This factor does not affect the determination as to whether a particular transaction constitutes a license. In granting a license, the patentee can retain any of the rights to make, sell and use,

while conveying others. *United States v. General Electric Co.,* 272 U.S. 476, 490, 47 S.Ct. 192, 197, 71 L.Ed. 362 (1926). Therefore, the fact that the arrangement with Shell gave Carbide no right to exploit methomyl, other than to use it in making Larvin, has no bearing on whether the Shell-Carbide arrangement constituted a sublicense.

 Nor, contrary to what the Court below assumed, does a licensing agreement necessarily require a particular royalty limitation. The Court of Chancery, looking only at the profits from the Purchase and Sale Agreement, found that Shell would be collecting approximately a 30% royalty in contrast to license royalties which are "normally in the 5% range." While it may be true that, in practice, most licensing arrangements carry 5% royalties, the fact that the margin of profit here may have been higher does not preclude a finding that the transaction into which Shell and Carbide entered was in fact a sublicense. A license may be "for any royalty." *United States v. General Electric, supra* at 489, 47 S.Ct. at 196.

 In *W.L. Gore Associates, Inc. v. Carlisle Corp.,* 3d Cir., 529 F.2d 614, 623, 624 (1976), the Third Circuit considered whether a license proposal involving a 30% royalty was unreasonable. In finding such proposal reasonable, the Court stated:

> The defendant's speculation as to the plaintiff's motives in offering a license at what the defendant considered an exhorbitant price, 30% of the defendant's gross sales of the patented product, we regard as irrelevant. The general rule is that, absent any overriding unlawful conduct, "A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly." *Brulotte v. Thys Co.,* 379 U.S. 29, 33, 85 S.Ct. 176, 179, 13 L.Ed.2d 99 (1964); *LaSalle Street Press, Inc. v. McCormick & Henderson, Inc.,* 445 F.2d 84, 95 (7th Cir. 1971); *Carter-Wallace, Inc. v. United*

*States,* 449 F.2d 1374, 1383, 196 Ct.Cl. 35 (1971).

*Id.* at 622–623. Therefore, in the world of bargained-for rights, no specific royalty percentage will automatically determine that a particular transaction is, or is not, a license. What Carbide bargained for was to pay Shell for use of its license rights under the DuPont patent. That is a sublicense.

\* \* \*

In summary, we conclude that the Court of Chancery committed legal error: (1) in finding that DuPont did not sustain its burden of proving that the License Agreement prevented Shell's toll conversion/sale-back arrangement with Carbide; (2) in construing Shell's "have made" and "sell" rights as overriding the License Agreement's prohibition against sublicensing; (3) in construing the Shell-Carbide 1981 arrangements as not tantamount to the grant of a sublicense; and (4) in elevating form over substance.

REVERSED.