Stuart A. RAFOS, Appellant,

v.

OUTBOARD MARINE CORPORATION, Appellee.

No. 92-2928.

United States Court of Appeals,
Eighth Circuit.

Submitted March 15, 1993.

Decided Aug. 6, 1993.

Rehearing Denied Sept. 8, 1993.

James M. Bausch, Lincoln, NE, argued (Susan Kubert Sapp, on the brief), for appellant.

David E. Springer, Chicago, IL, argued (Andrew J. McGuinness, Martha J. Burns, on the brief), for appellee.

Before BOWMAN and MORRIS · SHEPPARD ARNOLD, Circuit Judges, and MAGNUSON,[*] District Judge.

BOWMAN, Circuit Judge.

Stuart A. Rafos appeals from the District Court's[1] grant of summary judgment in favor of Outboard Marine Corporation (OMC). For the reasons discussed below, we affirm the judgment of the District Court.

In 1988, Rafos accepted an offer to become a manager of OMC's Turf Care Division and a vice president of OMC. He began working for OMC in March 1989. Rafos signed a severance agreement with OMC effective March 1, 1989, the interpretation of which presents the issue before this Court.

Shortly after hiring Rafos, OMC decided to sell its Turf Care Division. As part of OMC's plan to sell this division, OMC formed a wholly owned subsidiary, Cushman, Inc., to hold and operate the Turf Care Division assets. Rafos was made President and CEO of the new subsidiary. In a separate agreement between Rafos and OMC, Rafos was to receive specific benefits from OMC if he stayed through the completion of the sale of Cushman; among the benefits was a graduated bonus dependent on the amount by which the actual sale price of Cushman exceeded OMC's threshold price.

In August 1989, OMC entered into an agreement with Ransomes, PLC, for the sale of Cushman. The parties closed the transaction in September 1989, with Ransomes purchasing 100 percent of the Cushman stock. Rafos received a payment of $484,300 pursuant to his agreement with OMC concerning the sale of Cushman. Rafos was employed by Ransomes following the closing of this transaction, and he continued to work for Ransomes until he was discharged in October 1991.

Rafos filed a diversity action against OMC in June 1990[2] alleging breach of the severance agreement, and both parties moved for summary judgment. The District Court, finding the governing language of the severance agreement clear and unambiguous so that reference to extrinsic evidence was unnecessary, granted summary judgment in favor of OMC. Specifically, the court held that (1) Rafos was not entitled to benefits under the agreement absent a change in control of OMC,[3] and (2) the agreement did not permit Rafos to accept employment with Ransomes and then later collect severance benefits from OMC. Rafos appeals, contending that the court erred in its interpretation of the severance agreement. We affirm, basing our decision on the District Court's first ground and not reaching the second.

█ We review a grant of summary judgment de novo. *United States ex rel. Glass v. Medtronic, Inc.*, 957 F.2d 605, 607 (8th Cir. 1992). The standard we apply is the same as that applied by the District Court: whether the record shows there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

█ The severance agreement contains a choice-of-law clause stipulating that Delaware law will govern the validity, interpretation, construction, and performance of the agreement. Agreement § 7, at 24.[4] We review the interpretation of the agreement de novo in light of the controlling legal principles, which here, as the parties agree, are provided by Delaware law. We also review de novo the District Court's determination of

---

[*] The HONORABLE PAUL A. MAGNUSON, United States District Judge for the District of Minnesota, sitting by designation.

[1] The Honorable Warren K. Urbom, Senior United States District Judge for the District of Nebraska.

[2] Rafos filed this action while still employed by Ransomes alleging that his continued employment by Ransomes was immaterial to his recovery under the severance agreement with OMC.

[3] A "change in control" of OMC, as defined in the agreement, differs from the sale of a subsidiary; thus the sale of Cushman to Ransomes does not constitute a change in control under the agreement.

[4] The agreement is set out in full in Appellant's Appendix pages A11–A35.

questions of state law. *Salve Regina College v. Russell,* 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

The two clauses of the agreement which are central to this dispute read as follows:

2. *Change in Control of the Corporation.*

(i) No benefits shall be payable hereunder unless there shall have been a Change in Control of the Corporation [OMC], as set forth below....

. . . .

5. *Successors; Binding Agreement.*

(a) The Corporation will require any successor (whether direct or indirect, by purchase, merger, consolidation or otherwise) to all or substantially all of the business and/or assets of the Corporation or of any division or subsidiary thereof employing you to expressly assume and agree to perform this Agreement in the same manner and to the same extent that the Corporation would be required to perform it if no such succession had taken place. Failure of the Corporation to obtain such assumption and agreement prior to the effectiveness of any such succession shall be a breach of this Agreement and shall entitle you to compensation from the Corporation in the same amount and on the same terms as you would be entitled hereunder if you terminate your employment for Good Reason, except that for purposes of implementing the foregoing, the date on which any such succession becomes effective shall be deemed the Date of Termination.

Agreement § 2(i), at 3, § 5(a), at 22–23.

The parties make a variety of arguments regarding the interpretation of this contractual language. Our decision, however, is based narrowly on a single issue: whether a change in control of OMC was a condition precedent to OMC's duty to pay severance benefits to Rafos under the agreement. We agree with the District Court that OMC was not obligated to pay Rafos severance benefits absent a change in control of OMC.

Rafos does not dispute that a change in control of OMC did not occur.[5] Rather, he argues that Section 5 of the agreement creates a separate and independent obligation and triggers the payment of benefits if the requirements of that section are not performed, regardless of whether there is a change in control of OMC. Therefore, Rafos contends, since OMC did not require Ransomes to assume OMC's obligations under the severance agreement, OMC breached the agreement and must pay Rafos the benefits set forth in the agreement.[6] We disagree.

■ Although we agree that the language of Section 5, if viewed in isolation from the rest of the agreement, is susceptible to the reading Rafos propounds, we must interpret the contract as a whole and read the section in the context of the whole agreement. *Hudson v. D & V Mason Contractors, Inc.,* 252 A.2d 166, 169 (Del.Super.Ct.1969). The guiding principles have been stated as follows in a leading Delaware decision:

The basic rule of contract construction gives priority to the intention of the parties. In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein. Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan.

*E.I. du Pont de Nemours & Co. v. Shell Oil Co.,* 498 A.2d 1108, 1113 (Del.1985) (en banc) (citations omitted).

■ Viewing the severance agreement in its totality, we believe it is clear that the overall scheme or plan of the agreement was to protect Rafos in the event a change in

---

5. Section two of the agreement defines a change in control as occurring when specific changes take place related to stock ownership, voting rights, board membership, merger or consolidation, or liquidation of the corporate assets. Agreement § 2, at 3–6. All of these changes refer to OMC, not to a subsidiary of OMC such as Cushman, and it is undisputed that none of these events occurred.

6. OMC asserts that it complied with the terms of the severance agreement by causing both Cushman and Ransomes to assume that agreement. Rafos disputes this question of fact, which was not addressed by the District Court. Because of our holding concerning the interpretation of the agreement, we need not address this issue.

control of OMC occurred. Although Section 5 does not specify that it applies only if there has been a change in control of OMC, the language and structure of the entire agreement, from which we derive the intent of the parties, convinces us that a change in control was necessary to invoke the benefits of the agreement, including those provided by Section 5.

We note first that the introductory paragraphs of the severance agreement contain three references to a change in control:

[T]he Board of Directors of the Corporation (the "Board") recognizes that ... the possibility of a *change in control* may exist and that such possibility, and the uncertainty and questions which it may raise among management, may result in the departure or distraction of management personnel to the detriment of the Corporation and its stockholders.

The Board has determined that appropriate steps should be taken to reinforce and encourage the continued attention and dedication of members of the Corporation's management, including yourself, to their assigned duties without distraction in the face of potentially disturbing circumstances arising from the possibility of a *change in control* of the Corporation.

In order to induce you to remain in the employ of the Corporation and in consideration of your agreement set forth in paragraph (ii) of Section 2 hereof, the Corporation agrees that you shall receive the severance benefits set forth in this letter agreement ("Agreement") in the event your employment with the Corporation is terminated subsequent to a *"Change in Control of the Corporation"* (as defined in Section 2 hereof) under the circumstances described below.

Agreement at 1–2 (emphasis added). The language of these introductory paragraphs clearly contemplates that a change in control of OMC must take place before Rafos is entitled to the benefits of the agreement.

The substance of the key provisions of the agreement reinforces the intention expressed in the above-quoted introductory paragraphs. Section 1 sets the temporal limits of the agreement, and provides, *inter alia,* that "if a

*Change in Control of the Corporation* shall have occurred during the original or extended term of this Agreement, this Agreement shall continue in effect for a period of thirty-six (36) months beyond the month in which such *Change in Control of the Corporation* occurred." Agreement § 1, at 3 (emphasis added). Section 2, upon which OMC places considerable reliance, states unambiguously that "[n]o benefits shall be payable hereunder unless there shall have been a Change in Control of the Corporation, as set forth below." Agreement § 2(i), at 3. This section then proceeds to lay out a detailed definition of the term "Change in Control of the Corporation," and concludes by specifying that, "in the event of a potential Change in Control of the Corporation," Rafos will remain in the employ of the corporation for six months unless he dies or becomes disabled, or unless there occurs "a Change in Control of the Corporation." Agreement § 2, at 7.

Similarly, Section 3, which is headed "Termination Following a Change in Control of the Corporation," specifies that, if "a Change in Control of the Corporation shall have occurred" and "upon the termination of [Rafos's] employment during the term of this Agreement," Rafos shall be entitled to the severance benefits provided by the agreement, unless such termination is by reason of his death or disability, by the Corporation for cause, or by Rafos other than for "Good Reason." Agreement § 3, at 7–8. The term "Good Reason" is defined, in Subsection 3(c), as meaning the occurrence (without Rafos's express written consent) "after a Change in Control of the Corporation" of any one of several enumerated events. Agreement § 3(c), at 9. Significantly, one of these enumerated events is "the failure of the Corporation to obtain a satisfactory agreement from any successor to the Corporation to assume and agree to perform this Agreement, as contemplated in Section 5 hereof." Agreement § 3(c)(v), at 11. Finally, Section 4 of the agreement spells out in considerable detail the benefits to which Rafos shall be entitled *if his employment is terminated or he becomes disabled* "[f]ollowing a Change in

Control of the Corporation." Agreement § 4, at 13.

■ We then come to Section 5. It is undisputed that no change in control of OMC occurred. Rafos contends, however, that the language of the rest of the agreement does not control the interpretation of Section 5, and that Section 5 must be interpreted separately and independently. We disagree. As stated above, "the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *E.I. du Pont de Nemours & Co.*, 498 A.2d at 1113. Rafos offers no persuasive reason for reading Section 5 without reference to the rest of the agreement. Section 5 is part and parcel of a carefully drafted agreement, and the agreement contains nothing that suggests Section 5 is to be put on a different footing from the rest of the agreement. Absent any indication in the agreement that Section 5 was meant to be operative when the other obligation-creating provisions of the agreement would not be operative, we conclude that Section 5, like the rest of the agreement, is predicated upon a change in control of OMC.

Our conclusion is especially clear when we consider the unmistakable import of Section 3, which, *inter alia,* specifies that it shall be a "Good Reason" for Rafos to terminate his employment (and still be entitled to benefits under the agreement) if, *"after a Change in Control of the Corporation,"* OMC fails "to obtain a satisfactory agreement from any successor to the Corporation to assume and agree to perform this Agreement, *as contemplated in Section 5 hereof."* Agreement § 3(c)(v), at 9, 11 (emphasis added). This cross-reference to Section 5 makes manifest the intent of the parties that Section 5, like the rest of the agreement, was to become operative only upon a change in control of OMC.

We hold that Rafos is not entitled to receive benefits under Section 5 of the severance agreement absent a change in control of OMC. It is undisputed that a change in control of OMC did not occur. Accordingly,

the judgment of the District Court in favor of OMC is affirmed.

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.

I respectfully disagree with the court's interpretation of § 5 of the agreement. It deals, in pertinent part, not only with a change in control of the corporation (as that is defined in the agreement), but also with a sale of "all or substantially all of the … assets of … any … subsidiary thereof …," and it requires the defendant to cause any purchaser of a subsidiary to assume the agreement of which § 5 is a part. This is a wholly distinct and separate undertaking on the part of the defendant and has nothing to do with a change of control of the corporation itself. Its purpose was to ensure that the agreement would continue in force in the event a sale like the one to Ransomes was consummated and that Ransomes would specifically agree to be liable on it. The court's construction draws no strength from its invocation of § 3(c)(v) of the agreement. That provision simply makes it plain that plaintiff could resign and nevertheless be entitled to severance pay following a change of control if the corporation failed to secure an assumption of the agreement. There was no change of control here and plaintiff did not resign.

Nor do I agree with the district court's conclusion that the agreement did not permit plaintiff to accept employment with Ransomes and then receive severance benefits from OMC. The purpose of § 5 was to ensure that plaintiff enjoyed the same job security as he enjoyed before the succession and that the successor itself assume the obligation for that security. It therefore cannot have been a requirement that he not take up employment after the succession before the remedies provided in § 5 were available to him.

We are therefore left with the question of whether the corporation lived up to its obligation under § 5 to require Ransomes "to expressly assume and agree to perform this Agreement in the same manner and to the

same extent that the Corporation would be required to perform it if no such succession had taken place." Following the sale of all the stock of Cushman, of course, Cushman remained liable on all its obligations. *See Ruefenacht v. O'Halloran,* 737 F.2d 320, 333 (3d Cir.1984), *aff'd,* 471 U.S. 701, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985), and *Daily v. Morgan,* 701 F.2d 496, 504 (5th Cir.1983). The Purchase Agreement entered into between defendant and Ransomes specifically mentions contracts that provide severance pay for employees, and does so in a way that makes it plain that Ransomes understood that Cushman was indeed obligated to plaintiff in the same manner as defendant had been. *See* § 2.13. But the fact that the severance obligations survived the transfer is of no particular relevance. The relevant question is whether Ransomes itself assumed those obligations. Under § 6.08 of the Purchase Agreement, Ransomes agreed to "cause ... the Cushman Companies ... to maintain ... severance arrangements for Employees of ... Cushman ... which are, in the aggregate, not less favorable to such individuals than those provided to them by Sellers or the Cushman Companies immediately prior to the Closing Date." It is not clear that this adds anything whatever to Cushman's legal obligations, and whatever it may add to Ransomes' it is not an assumption of liability by them. It is not even a guarantee by Ransomes of Cushman's performance.

I would therefore reverse the district court and remand for further proceedings on defendant's asserted affirmative defenses.