# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MURPHY MARINE SERVICES OF DELAWARE, INC., THE THOMAS M. BROWN, SR. 2006 TRUST FBO JOHN M. BROWN, JR., THE THOMAS M. BROWN, SR. 2006 TRUST FBO TERRANCE M. BROWN JR., THE THOMAS M. BROWN, SR. 2006 TRUST FBO TIMOTHY M. BROWN, THE THOMAS M. BROWN, SR. 2006 TRUST FBO THOMAS M. BROWN, JR., | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) C.A. No. 2018-0664-SG ) |
| GT USA Wilmington, LLC, | ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Date Submitted:  January 19, 2021
Date Decided:  May 28, 2021

Michael P. Kelly, Daniel M. Silver, and Travis J. Ferguson of MCCARTER & ENGLISH, LLP, Wilmington, Delaware, *Attorneys for Plaintiff Murphy Marine Services of Delaware, Inc*.

Geoffrey G. Grivner of BUCHANAN INGERSOLL & ROONEY PC, Wilmington, Delaware, *Attorneys for Plaintiffs The Thomas M. Brown, Sr. 2006 Trust FBO John M. Brown, Jr., The Thomas M. Brown, Sr. 2006 Trust FBO Terrance M. Brown, Jr., The Thomas M. Brown, Sr. 2006 Trust FBO Timothy M. Brown, and The Thomas M. Brown, Sr., 2006 Trust FBO Thomas M. Brown, Jr.*

David A. Dorey and Brandon W. McCune of BLANK ROME LLP, Wilmington, Delaware, *Attorneys for Defendant GT USA Wilmington, LLC*.

**GLASSCOCK, Vice Chancellor**

This matter involves an agreement for the new long-term private operator of the Port of Wilmington (the "Port"), Defendant GT USA Wilmington, LLC ("GT"), to purchase the entirety of a stevedore business operating at the Port, Plaintiff Murphy Marine Services of Delaware, Inc. ("Murphy Marine"). Prior to the arrival of GT, the Port was operated by the Diamond State Port Corporation ("DSPC"), a corporate entity of the State of Delaware.[1] That a deal took place at all was likely the result of pressure applied by the State of Delaware (via the Secretary of State's office), which wished to obtain the advantages of port privatization rather than maintaining State control; at the same time, it wished to reduce or eliminate damage that could result to stakeholders and participants at the Port, notably Murphy Marine. The Secretary of State made this abundantly clear to the parties, both of whom felt "pressure" to comply.[2]

Thus encouraged, the parties negotiated an agreement (the Binding Letter Agreement, or "BLA") under which Murphy Marine's stockholders would sell 100% of Murphy Marine's stock to GT, in return for payment of the going concern value of Murphy Marine. The latter was to be determined, per the agreement, from a fair market valuation analysis to be done by a prominent accounting firm, KPMG LLP ("KPMG"). KPMG rendered a valuation range; the parties dispute whether that

---

[1] Joint Statement of Stipulated Facts ¶ 8, Dkt. No. 231 [hereinafter "Post-Trial Stip."].
[2] Post-Trial Stip. ¶¶ 12–13.

product was a final valuation in light of the BLA, whether the valuation was tainted or otherwise improper, and whether the BLA is enforceable under the circumstances.

I bifurcated this matter—Phase I involves certain discrete predicate issues of contract interpretation only.[3] Trial was held on Phase I: this is my post-trial decision on certain contractual issues.

## I. BACKGROUND[4]

### A. The Parties

Plaintiff Murphy Marine is a corporation formed under the laws of Delaware with its principal place of business in Wilmington, Delaware.[5] For over 40 years, Murphy Marine was engaged in the business of stevedoring at the Port of Wilmington, which was its only stevedoring operation.[6] Murphy Marine no longer actively operates in the Port.[7]

Plaintiffs The Thomas M. Brown, Sr. 2006 Trust FBO John M. Brown, Jr., The Thomas M. Brown, Sr. 2006 Trust FBO Terrance M. Brown, Jr., The Thomas

---

[3] The other outstanding issues will be addressed in Phase II.

[4] I recite the facts as I find them based upon the evidence submitted by the parties. Unless otherwise noted, the facts in this Background were stipulated by the parties or proven by a preponderance of evidence. To the extent there was conflicting evidence, I have weighed the evidence and made findings based on the preponderance of the evidence. In pursuit of brevity, I sometimes omit from this Background discussion testimony in conflict with the preponderance of the evidence. In such cases, I considered the conflicting testimony, and I rejected it. Where the facts of this post-trial opinion are drawn from exhibits jointly submitted at trial, they are referred to according to the numbers provided on the parties' joint exhibit list ("JX __, at ___").

[5] Post-Trial Stip. ¶ 1.

[6] Post-Trial Stip. ¶¶ 2–3.

[7] Post-Trial Stip. ¶ 4.

M. Brown, Sr. 2006 Trust FBO Timothy M. Brown, and The Thomas M. Brown, Sr., 2006 Trust FBO Thomas M. Brown, Jr. are shareholders of Murphy Marine.[8]

Defendant GT is a limited liability company incorporated in the state of Delaware with its registered agent located in Wilmington, Delaware.[9] GT is a subsidiary of Gulftainer Company Ltd., a global entity headquartered in the United Arab Emirates and the largest privately-owned port operator in the world.[10] GT is in the business of managing and operating the Wilmington Port Terminal[11] and was formed in connection with the opportunity to privatize the Port.[12]

*B. Relevant Facts*

In 2017, the DSPC, a corporate entity of the State of Delaware and the then-current operator of the Port, solicited bids for a public/private partnership to improve, develop, finance, and/or operate the Port via a long-term concession agreement with the DSPC.[13] GT was ultimately identified as the preferred bidder and, by the end of 2017, entered into a Non-Disclosure Agreement with Murphy Marine in connection with a possible purchase of Murphy Marine by GT.[14]

---

[8] Post-Trial Stip. ¶ 5.
[9] Post-Trial Stip. ¶ 6.
[10] Post-Trial Stip. ¶ 7.
[11] Joint Phase 1 Pre-Trial Stipulation and Order ¶ 5, Dkt. No. 221 [hereinafter "Pretrial Stip."].
[12] Post-Trial Stip. ¶ 9.
[13] Post-Trial Stip. ¶ 8.
[14] Post-Trial Stip. ¶¶ 10–11.

On April 11, 2018, representatives of Murphy Marine and GT, along with the Delaware Secretary of State, attended a meeting and discussed GT purchasing Murphy Marine, subject to reducing any final agreement to writing.[15] Although the State of Delaware did not require GT to buy Murphy Marine, both Murphy Marine and GT have expressed that they felt pressure from the state to transact.[16] Accordingly, on April 11, 2018, Murphy Marine sent an initial draft of a binding letter agreement (defined above as the "BLA") to GT.[17]

By this time, the privatization of the Port, and GT's status as the preferred bidder, were widely known.[18] Also at the April 11, 2018 meeting, GT representative Peter Richards and Murphy Marine representative John Brown, Jr. agreed to select a Big Four valuation firm to value Murphy Marine.[19]

The parties proceeded to exchange five drafts of the BLA before finalizing it on April 24, 2018.[20] By June 2018, the parties had identified KPMG as their preferred valuator.[21] The parties exchanged drafts of an engagement letter for KPMG (the "Engagement Letter")[22] and both parties concede that KPMG stated that

---

[15] Post-Trial Stip. ¶ 16.
[16] *See* Post-Trial Stip. ¶¶ 12–14.
[17] Post-Trial Stip. ¶ 18; Pretrial Stip. ¶¶ 16–17.
[18] *See* Post-Trial Stip. ¶ 15.
[19] Post-Trial Stip. ¶ 25.
[20] *See* Post-Trial Stip. ¶¶ 17–23.
[21] Post-Trial Stip. ¶ 37.
[22] Post-Trial Stip. ¶¶ 38–39.

it would not provide a specific price point in its valuations of Murphy Marine, but rather would provide a valuation range.[23]

On the morning of July 6, 2018, GT's CEO, Peter Richards, sent GT's final, agreed-upon BLA for execution to Murphy Marine.[24] Both the Engagement Letter and the BLA were executed at an in-person meeting that same day, although the Engagement Letter was signed before the BLA.[25] Peter Richards ("Richards") executed the BLA and Engagement Letter on GT's behalf in his capacity as Chief Executive Officer.[26] John Brown, Jr. ("Brown, Jr.") executed the BLA on behalf of Murphy Marine's stockholders; *i.e.*, as Trustee of the Thomas M. Brown, Sr. 2006 Trust FBO John M. Brown, Jr. and The Thomas M. Brown, Sr. 2006 Trust FBO Terrance M. Brown, Jr., and as the authorized representative of The Thomas M. Brown, Sr. 2006 Trust FBO Timothy M. Brown and The Thomas M. Brown, Sr. 2006 Trust FBO Thomas M. Brown, Jr.[27] Murphy Marine is not, itself, a party to the BLA.[28] Brown, Jr. executed the Engagement Letter on behalf of Murphy Marine, as Chairman of its board of directors.[29]

---

[23] *See* Pretrial Br. of Def. 23, Dkt. No. 206 [hereinafter "Def.'s Pretrial Br.]; Pls.' Phase I Post-Trial Opening Br. 24, Dkt. No. 237 [hereinafter "Post-Trial OB"].
[24] Post-Trial Stip. ¶¶ 48.
[25] Post-Trial Stip. ¶¶ 41–42.
[26] Post-Trial Stip. ¶ 46.
[27] JX 102.
[28] *See* JX 102.
[29] JX 100.

On August 20, 2018, KPMG provided its draft price range for Murphy Marine.[30] This valuation did not consider the effect of GT's imminent privatization of the Port of Wilmington, which would have caused Murphy Marine's value to represent liquidation value, rather than its value as a going concern.[31] This draft estimate valued Murphy Marine's enterprise value at between $23,801,700 and 28,448,100.[32] Murphy Marine's equity—*i.e.*, its value less debt, was valued at between $21,486,400 and $26,132,800.[33] GT was displeased by KPMG's valuation[34] and responded by requesting KPMG "fix its analysis" to comply with the Engagement Letter and declined to sign off on the valuation until its concerns were addressed.[35] One of GT's concerns was that the effect of the privatization of the Port of Wilmington was not included in KPMG's valuation.[36] KPMG responded to this concern by noting that it took "a market participant view of the business in that it will operate as a going concern."[37] Further, KPMG appears to have been puzzled by GT's point about privatization; in its redline draft of responses to GT's questions, a comment remarks that "I don't understand what [GT's] point is on this.

---

[30] GT USA Wilmington, LLC's Answer ¶ 4, Dkt. No. 111 [hereinafter "Answer"].
[31] JX 145 ¶ 2.
[32] JX 144, at 5.
[33] JX 144, at 5.
[34] *See* JX 146.
[35] Answer ¶ 5.
[36] JX 145 ¶ 2.
[37] JX 145 ¶ 2.

Do you know? What does the privatization of the Port have to do with what we are doing?"[38]

KPMG later suspended its work.[39] Murphy Marine filed its complaint for specific enforcement of the BLA on September 7, 2018.[40]

On October 2, 2019, I indicated in a teleconference with the parties that I believed that bifurcation of the issues raised by the parties would be appropriate.[41] The first phase would address the contractual issue—*i.e.*, the meaning of the contract between the parties.[42] The second phase would address the remaining issues, including, for example, what information was presented by Murphy Marine to KPMG for use in forming its valuation.[43] I ordered the bifurcation on January 15, 2020.[44]

Trial on the Phase I issues was held on September 9 and September 10, 2020.[45] Post-trial argument was held on January 19, 2021.[46] This post-trial opinion addresses the Phase I issues presented at trial—*i.e.*, what agreements constitute the full contract between the parties and whether the BLA is ambiguous.

---

[38] JX 145.
[39] Answer ¶ 6.
[40] Verified Compl. For Specific Performance and Declaratory J., Dkt. No. 1.
[41] Tr. of 10-2-19 Telephonic Scheduling Conference, at 9, Dkt. No. 108.
[42] Tr. of 10-2-19 Telephonic Scheduling Conference, at 9, Dkt. No. 108.
[43] Tr. of 10-2-19 Telephonic Scheduling Conference, at 9, Dkt. No. 108.
[44] Judicial Action Form dated Jan. 15, 2020, Dkt. No. 130.
[45] Judicial Action Form dated Sept. 11, 2020, Dkt. No. 223.
[46] *See* Tr. of Jan. 19, 2021, Post-Trial Oral Argument, Dkt. No. 255.

## 1. The BLA

Much of the BLA is relevant to the analysis here. Paragraphs 1 through 4 provide that:

> 1. The Shareholders hereby agree to sell, and GT hereby agrees to buy or pay . . . an amount equal to a fair market valuation of purchase, 100% of the shares "Shares" of Murphy Marine . . . at the closing.
>
> 2. The price for the Shares shall be their fair market value, which shall be determined by an independent valuation conducted by KPMG who was selected by the mutual agreement of the parties. KPMG has been mutually retained by the parties.
>
> 3. KPMG shall be advised to assume the transaction is between a willing buyer and a willing seller, with neither under any compulsion to buy or sell, but shall be otherwise free to determine the free market value of the [Murphy Marine] Shares at its sole discretion and through whatever valuation method or methods it deems most appropriate. KPMG's decision shall be final and binding upon the parties.[47]
>
> 4. KPMG shall be instructed to prepare two (2) valuations: one (1) that considers the impact, if any, on the value of [Murphy Marine] by the presence of that certain unfunded pension liability of [Murphy Marine] . . . (the "Pension Liability Price") and a second valuation that does not consider any such impact (the "Guarantee Price"). The Shareholders shall have the option, in their sole discretion, to receive the Guarantee Price if, and only if, the Shareholders guarantee to indemnify and pay on GT's behalf any actual pension liability that GT may incur after the execution of this Agreement . . . .[48]

The parties agree that, in Paragraph 3, the words "assume the transaction is between a willing buyer and a willing seller, with neither under any compulsion to buy or sell" did not change in any draft of the BLA between April 11 and April 24, 2018,

---

[47] JX 102 ¶ 3.
[48] JX 102 ¶¶ 1–4.

other than eventually changing the word "compunction" in the original draft to "compulsion," which was the word used in the executed version.[49]

## 2. The Engagement Letter

The Engagement Letter provides that KPMG understood

> that you [Murphy Marine and GT] would like us [KPMG] to assist you with a pricing analysis of a 100 percent equity interest . . . in [Murphy Marine] as of April 30, 2018 or other recent pricing date . . . established by the Companies strictly for the Companies internal planning purposes related to a potential sale of [100% interest in Murphy Marine] to GT. . . . The pricing analysis cannot be used to determine the purchase price. Our analysis is intended to provide a range of the prices of the [100% equity interest in Murphy Marine] which is supportable in terms of relevant pricing approaches such as comparisons to sales of other companies, discounted cash flow analyses, or other earnings-based analyses.[50]

The Engagement Letter then proceeded to "outline the professional arrangements, objectives, scope, pricing approach, and deliverables" of KPMG's valuation.[51]

## II. ANALYSIS

At this post-Phase-I-trial stage, there are three issues before me. The first concerns two agreements: (a) the binding letter agreement (defined above as the "BLA") between the Plaintiff stockholders of Murphy Marine and GT and (b) the engagement letter between KPMG, a Big Four valuation firm, and Murphy Marine and GT (defined above as the "Engagement Letter"). The Plaintiffs assert that the

---

[49] Post-Trial Stip. ¶ 24.
[50] JX 100, at 1.
[51] JX 100, at 1.

BLA is the sole agreement between the parties regarding the sale and purchase of Murphy Marine's stock.[52] The Defendant argues that both the BLA and the Engagement Letter govern the purchase of Murphy Marine's shares. The composition of the agreement between the parties regarding the sale of Murphy Marine shares is of particular interest to the parties because the Engagement Letter provides for a draft valuation and discussion period, while the BLA provides that "KPMG's decision shall be final and binding upon the parties."[53] Should the Engagement Letter be part of the entire agreement between the parties, in the Defendant's view, it would not be bound by KPMG's valuation, as the valuation would not be a final valuation under the Engagement Letter.

The second issue concerns the meaning of Paragraph 3 of the BLA. The parties dispute whether that provision allowed KPMG to value Murphy Marine in consideration of the effect of privatizing the Port of Wilmington on Murphy Marine's business. GT's privatization of the Port of Wilmington, if GT did not acquire Murphy Marine, would have a drastically detrimental effect on Murphy Marine's value; GT, which is the largest privately-owned port operator in the world,[54] could have started its own stevedoring business and shuttered Murphy Marine's business entirely by denying it access to the Port. At the time the BLA

---

[52] Post-Trial OB 1.
[53] JX 102 ¶ 3.
[54] Post-Trial Stip. ¶ 7.

was executed, the privatization of the Port of Wilmington was a done deal already; the BLA was negotiated in connection with that privatization but postdated the privatization.[55] Thus, the parties knew at that time that if GT did not acquire Murphy Marine, Murphy Marine's stockholders would face the very real possibility that GT, as the new owner of the Port of Wilmington, would deny it future access to the Port, thus shuttering its business.[56] The parties disagree as to whether Paragraph 3 of the BLA allows KPMG to import that possibility into its value analysis.

The third and final issue concerns what price Murphy Marine's stockholders were entitled to receive based on KPMG's valuation. KPMG refused to provide a precise price point and agreed only to provide a range in each of its valuations. The Plaintiffs argue that such a structure implies a price at the midpoint of each range. The Defendants argue that such midpoint is not explicitly provided for and not implied by the language.

For the foregoing reasons, I conclude (1) that the BLA constituted the entire agreement between the parties with regards to the purchase of Murphy Marine's equity, (2) that the BLA unambiguously prohibited KPMG from valuing Murphy Marine in light of the privatization of the Port of Wilmington, and (3) that the BLA

---

[55] Post-Trial Stip. ¶ 15.
[56] In fact, Murphy Marine is no longer active in the Port of Wilmington. Post-Trial Stip. ¶ 4.

11

is ambiguous regarding determining the price point, but that the extrinsic evidence points to use of the midpoint of the valuation range. My reasoning follows.

*A. Relevant Legal Standards*

"Under standard rules of contract interpretation, a court must determine the intent of the parties from the language of the contract."[57] Only when an ambiguity exists will a court look beyond the language of a contract.[58] "[A]n ambiguity exists '[w]hen the provisions in controversy are fairly susceptible of different interpretations'" or may reasonably be read to have two or more meanings.[59]

*B. The BLA alone represents the agreement regarding the sale of Murphy Marine's stock.*

The Plaintiffs argue that the BLA is the sole document governing the sale of 100% of the equity interest in Murphy Marine; they will assert in Phase II of this litigation that the valuation provided by KPMG is valid and binding on GT.[60] The Defendant contends that the BLA and the Engagement Letter together form the agreement between the parties and, therefore, KPMG's valuation is not binding as it is only a draft under the Engagement Letter.[61] The Plaintiffs' position as to the parties' contract is, in my view, correct.

---

[57] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014).
[58] *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).
[59] *Id.*
[60] Post-Trial OB 33–39.
[61] *See* Post-Trial Br. of Def. GT USA Wilmington, LLC 61–64, Dkt. No. 246 [hereinafter "Post-Trial AB"].

In making this determination, I bear in mind the well-settled principle that "the parole evidence rule bars the admission of evidence from outside the contract's four corners to vary or contradict . . . unambiguous language."[62]  Thus, unless I find the BLA's language to be ambiguous, there is no reason to consider the Engagement Letter as part of the agreement to sell and purchase Murphy Marine's shares.  Upon a reading of the BLA, I do not find it to be ambiguous regarding the sale and purchase of Murphy Marine's shares.

The agreement between the parties regarding the sale of 100% equity interest in Murphy Marine is represented by the BLA.  That document defines the parties' duties and rights with regards to "purchase[] [of] 100% of the shares . . . of Murphy Marine."[63]  For example, it provides that "[t]he Shareholders hereby agree to sell, and GT hereby agrees to buy" Murphy Marine's shares.[64]  It defines the price for the shares to be purchased as "fair market value, which shall be determined by an independent valuation conducted by KPMG, who was selected by the mutual agreement of the parties."[65]  Although it notes that "KPMG has been mutually retained by the parties"[66] for the valuation process, it does not incorporate by reference any terms in the Engagement Letter to govern that valuation.[67]  Rather, it

---

[62] *GMG*, 36 A.3d at 783.
[63] JX 102 ¶ 1.
[64] JX 102 ¶ 1.
[65] JX 102 ¶ 2.
[66] JX 102 ¶ 2.
[67] JX 102 ¶ 2.

provides that KPMG "shall be free to determine the fair market value of the Shares at its sole discretion."[68] And where the BLA provides KPMG further instructions, it does so explicitly and without reference to the Engagement Letter. For example, the BLA provides instructions regarding what KPMG must prepare (two valuations, one considering the impact of a certain liability, and one without), again without reference to the Engagement Letter.[69] Given the BLA's simple, but fairly comprehensive, treatment of KPMG and its valuation task—giving it sole discretion and explaining what valuations it must prepare—there is no need, to my mind, to look beyond the four corners of the BLA for the agreement between Murphy Marine stockholders and GT as to the purchase of Murphy Marine's shares and how it was to be executed.

The Defendant argues, however, that *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*[70] is analogous and controlling here. In that case, a license agreement between DuPont and Shell "expressly prohibited the licensee [Shell] from sublicensing," but allowed Shell to sell the patented product and to have others make the product for it.[71] To get around the license agreement's prohibition on sublicensing, Shell and another entity, Carbide, entered into two agreements: a toll

---

[68] JX 102 ¶ 3. This discretion is, in one respect, contractually cabined, as explained *infra*.
[69] JX 102 ¶ 4.
[70] 498 A.2d 1108 (Del. 1985).
[71] *E.I. du Pont*, 498 A.2d at 1110.

conversion agreement and a sale agreement.[72]  Those two agreements would allow Carbide to produce the patented product for Shell's account, and then buy back from Shell some or all of the manufactured product.[73]  Together, the agreements functioned as a sublicensing agreement.  Anticipating that DuPont would take issue with this structure as violating its prohibition on sublicensing, Shell's counsel's notes indicated that the use of separate agreements was "not merely 'cosmetic'" and "[e]ach agreement should be able to stand on its own."[74]  The two agreements were to be "good faith exercise[s] of [Shell's] rights to 'have made' and 'sell back'" the licensed product.[75]

Shell's lawyers accomplished their goal; the Supreme Court noted that "were each contract to be considered in a vacuum, each would constitute a permissible exercise of Shell's Rights."[76]  However, the court concluded, "because of the manner in which the parties entered into the Toll Conversion Agreement and the Purchase and Sale Agreement, it is obvious that these Agreements cannot be considered apart from one another and must be read together as two parts of the same business transaction."[77]  The Supreme Court took note of particular facts that indicated that the two Agreements together formed a single transaction.  For example, it noted that

---

[72] *Id.* at 1111–12.
[73] *Id.* at 1111.
[74] *Id.* at 1112.
[75] *Id.*
[76] *Id.* at 1114.
[77] *Id.*

"[b]oth Agreements were entered into on the same date and cover[ed] the same time period."[78] Further, the minimum quantities of the product "which Carbide [had to] make for Shell under the Toll Conversion Agreement and which Carbide must then buy back from Shell under the Purchase and Sale Agreement [were] *identical*."[79] Finally, the two agreements "work[ed] in tandem with respect to ordering, delivery and payment."[80] Given the coordination between the two agreements, the Supreme Court held that the two agreements together "form[ed] one contract and must be examined as such."[81]

That is not analogous to the case here. In *E.I. du Pont*, the contracts could not be read separately to effectuate the parties' intent; in fact, they were structured separately to *avoid the consequences* of that intent. Nothing similar is present here. Although the Engagement Letter and the BLA were entered into on the same day, the parties to the two documents are not the same—unlike in *E.I. du Pont*. GT is a signatory to both the Engagement Letter and the BLA;[82] however, Murphy Marine is only a party to the Engagement Letter and not the BLA, and the Plaintiff stockholders of Murphy Marine are only party to the BLA and not the Engagement

---

[78] *Id.* at 1115.
[79] *Id.* (emphasis added).
[80] *Id.*
[81] *Id.*
[82] JX 100; JX 102.

Letter.[83] KPMG is a party to the Engagement Letter but not the BLA.[84] Although the same principal signed for both the stockholders and Murphy Marine, the parties themselves were not the same. Murphy Marine was not selling its shares; its stockholders were. And Murphy Marine's stockholders were not retaining KPMG; Murphy Marine was.[85] This, to my mind, is not fatal to the application of the *E.I. du Pont* doctrine, but it is evidence that the parties themselves saw the BLA and the Engagement Letter as related, but not two parts of a whole.

The Defendant points out that, like the Toll Conversion Agreement and the Purchase and Sale Agreement in *E.I. du Pont*, the Engagement Letter and the BLA were entered into and executed on the same day.[86] True. But the parties also stipulate that the BLA was signed *after* the Engagement Letter.[87] If the documents were intended to constitute the same agreement, in my view, the BLA would likely have incorporated by reference the entirety or provisions of the Engagement Letter, rather than merely noting that KPMG would be retained.

Nor are the Engagement Letter and the BLA intertwined as were the two agreements in *E.I. du Pont*. In *E.I. du Pont*, the quantities to be exchanged were

---

[83] JX 100; JX 102.

[84] JX 100; JX 102.

[85] *See Pauley Petroleum, Inc. v. Continental Oil Co.*, 231 A.2d 450, 454 (Del. Ch. 1967) (noting that "a corporate entity must be regarded as more than a mere formality. It is an entity distinct from its stockholders even if its stock is wholly owned by one corporation.").

[86] Post-Trial Stip. ¶ 41.

[87] Post-Trial Stip. ¶ 42.

identical and the provisions governing ordering, delivery, and payment worked in tandem. Here, the only interaction between the Engagement Letter and the BLA is that the BLA required Murphy Marine and GT to retain KPMG—had the Engagement Letter only contained a retention provision, the BLA could still have been fulfilled. The Engagement Letter supported the BLA, but it did not alter its terms. The BLA, after all, had independently granted KPMG sole discretion as to the calculation of the valuation and provided some detail as to the two valuations required of KPMG.[88] In short, the parties' intent in *E.I. du Pont* was to effectuate a sublicense; neither contract alone was sufficient to achieve such. Here, the parties' intent was a sale of Murphy Marine's shares; the BLA is sufficient to that intent. I do not find *E.I. du Pont* to be analogous here and read the BLA and the Engagement Letter as separate agreements.

Given the lack of explicit intent to incorporate the Engagement Letter, and absent any obvious indications that the BLA is, itself, insufficient to govern the purchase and sale of Murphy Marine's shares, I conclude that the BLA alone constitutes the entirety of the agreement between Murphy Marine's stockholders and GT regarding the purchase of 100% of the equity interest in Murphy Marine.

---

[88] JX 102 ¶¶ 3–4.

*C. The BLA precludes incorporation of privatization in the value analysis.*

The parties have stipulated that they agreed that Murphy Marine "was to be valued as a going concern."[89] The BLA gives KPMG plenary authority to determine a value for Murphy Marine, which would constitute the "legally binding price" for the purchase by GT.[90] KPMG's discretion in that regard was explicitly cabined, however. The BLA provides at Paragraph 3 that "KPMG shall be advised to assume the [hypothetical transaction underlying the valuation] is between a willing buyer and a willing seller, with neither under any compulsion to buy or sell"—otherwise, KPMG's discretion in valuation was unlimited.[91] Although the parties agree that Paragraph 3 is unambiguous, they disagree as to whether it allows KPMG to value Murphy Marine in light of GT's control of the Port of Wilmington, which was, by the time of the BLA's execution, a *fait accompli*.[92] If the hypothetical transaction is between Murphy Marine and a willing buyer *in light of the privatization*, such a buyer would be faced with the proposition that it would be directly competing for stevedoring business at the Port of Wilmington *with the controller of the Port itself*. GT would have the ability to exclude Murphy Marine from its sole source of cash flow. This is the dismal prospect that these parties have stipulated that they were

---

[89] Post-Trial Stip. ¶ 50.
[90] JX 102 ¶ 3.
[91] JX 102 ¶ 3.
[92] *See* Post-Trial OB 39; Post-Trial AB 21.

"pressured" by the State to solve via a sale/purchase of Murphy Marine.[93] Logically, a valuation in these circumstances would approach liquidation value.

It is worth pointing out why this issue is relevant to the Phase I determination of contractual intent. It is GT, not Murphy Marine, that is arguing that the valuation provided by KPMG is invalid.[94] It also contends that the valuation was tainted because Murphy Marine withheld from KPMG its business projections in light of Port privatization.[95] If the Defendant is correct, Phase II of this trial will involve, *inter alia,* whether the valuation done by KPMG is invalid because (per GT) Murphy Marine caused KPMG to disregard privatization, which KPMG might have considered in its sole discretion.[96]

The Plaintiffs argue that the BLA does not allow KPMG to value Murphy Marine based on the effect of privatization, noting that Paragraph 3 of the BLA provides that "KPMG shall be advised to assume the transaction is between *a willing buyer and a willing seller* . . . with neither under any compulsion to buy or sell."[97] Per the Plaintiffs, the "willing buyer and a willing seller" language "eliminates Port Privatization from KPMG's valuation exercise" because privatization, according to

---

[93] Post-Trial Stip. ¶¶ 12–13.
[94] GT raises several issues with the valuation, including that it was not final under the parties' agreement. Answer ¶ 7.
[95] *See* Answer, at Affirmative Defenses ¶ 12.
[96] *E.g.*, Post-Trial AB 59 (discussing evidence of Murphy Marine's "intentional concealment from KPMG" of its beliefs about the effect of privatization on its business).
[97] JX 102 ¶ 3.

20

the Plaintiffs, renders a sale of Murphy Marine as a going concern to an uncoerced and willing buyer an impossibility. For its part, the Defendant posits that the BLA gives KPMG "sole discretion,"[98] that such phrase is unambiguous and unqualified by other modifiers, and that the language cited by the Plaintiffs merely (if redundantly) instructs KPMG to do a market valuation.

I agree with the Plaintiffs' interpretation. Privatization would allow GT to replace Murphy Marine with its own stevedoring operation, ending Murphy Marine's going-concern value as a stevedore service for the Port of Wilmington; again, that was the situation the State pressured GT to avoid.[99] The parties agreed that Murphy Marine be valued as a going concern;[100] that is, not simply via a liquidation value based on its assets. An uncoerced "willing buyer willing seller" hypothetical is inconsistent with an assumption that GT could thereafter drive Murphy Marine from any business at the Port and drive its cash flows towards zero. In the BLA, the parties agreed to give KPMG broad discretion in valuation, but cabined that discretion to those methodologies intended to produce going concern value as would be recognized by a willing buyer and seller. I find the plain language of the BLA incompatible with a valuation based on privatization of the Port.

---

[98] JX 102 ¶ 3.

[99] *See* Post-Trial Stip. ¶¶ 12–13. While the State wished to privatize Port operations, it sought also to protect local interest at the Port from the adverse effects of such privatization. *See* Trial Tr. 9-9-20 Phase 1 Trial, at 180:17–180:23, Dkt. No. 226 [hereinafter "Trial Tr. 1"]; 9-10-2020 Phase I Trial Tr. Vol. II, at 509:9–509:13, Dkt. No 227 [hereinafter "Trial Tr. 2"].

[100] Post-Trial Stip. ¶ 50.

Because, in my view, Paragraph 3 is unambiguous, I need not reach consideration of any extrinsic evidence. I note, however, that a cursory review of extrinsic evidence supports the interpretation that the parties did not intend that KPMG should value Murphy Marine in light of privatization of the Port.[101]

*D. The BLA is ambiguous regarding resolution of the KPMG value ranges to a price point; extrinsic evidence supports an agreement to use the midpoint.*

The parties also dispute the meaning of Paragraph 4 of the BLA. That provision instructs KPMG to prepare two valuations, one considering the presence of a certain unfunded pension liability (which would yield the Pension Liability Price), and one without such consideration (which would yield the Guarantee Price).[102] Paragraph 4 also provides that "[t]he Shareholders shall have the option, in their sole discretion, to receive the Guarantee Price if, and only if, the Shareholders guarantee to indemnify and pay on GT's behalf any actual pension

---

[101] For example: (a) KPMG exhibited confusion when GT raised the effect of privatization in response to its draft valuation, JX 145; (b) in an internal GT email, a GT director stated that, when he "requested privatization process to be considered," the Murphy Marine lawyer's response that he "had crossed a line and violated [the] agreement which was to not consider privatization," which he agreed was a "[f]air point, but tough luck, I need to protect our position," JX 142; and (c) an internal GT email chain showed a GT principal noting that Murphy Marine "will argue that [privatization] is not to be considered in the valuation which should assume a going concern concept" and asking "[s]hould we still accept this position as per our previous discussions? It brings the risk of a higher price but on the other hand the value of [Murphy Marine] would be very little if privatization is fully included." JX 142. The response to that e-mail, from another GT principal, was "[a]s per our conversation this morning[,] play the card of the port privati[z]ation but be reasonable. If we want to finish this[,] we should be looking at accepting a value of less than $8M, without screwing them completely." JX 142.
[102] JX 102 ¶ 4.

liability that GT may incur after the execution of this Agreement . . . ."[103]  It also provides an exception, where "the difference between the Pension Liability Price and the Guarantee Price [is] . . . zero ($0), then the Shareholders shall guarantee . . . to indemnify GT for one-half (50%) of the then-unfunded pension liability attributable to [Murphy Marine], not to exceed $3,000,000."[104]  These references to *the* Pension Liability Price and *the* Guarantee Price implicitly assume a valuation price point.

On meeting with KPMG on July 6, 2018, the parties learned that KPMG was willing to issue only a range of value, and not a price point, for each of the Pension Liability Price and the Guarantee Price assumptions.[105]  It is clear that a range is incompatible with the BLA, which, again, assumes a price point.  The Plaintiffs argue that KPMG's agreement to provide a range of value for Murphy Marine implies that the parties agreed that the Plaintiff stockholders would receive the midpoint of the two valuations.[106]  The Defendant posits that the absence of an explicit "midpoint agreement" in the BLA means that no such agreement was

---

[103] JX 102 ¶ 4.
[104] JX 102 ¶ 4.
[105] Pls.' Corrected Phase 1 Pre-Trial Br. 22–23, Dkt. No 209 [hereinafter "Pls.' Pretrial Br."]; Def's Pretrial Br. 23.
[106] Pls.' Pretrial Br. 23.

reached.[107] Accordingly, their position is that the KPMG valuation is insufficient to set a price under the BLA.[108]

As has been true for the rest of this Memorandum Opinion, I am again bound by the well-settled principle that, unless a contract is ambiguous, I may only look to the four corners of the agreement.[109] Here, however, the BLA is silent as to how the parties were to reach a price point. This is particularly odd in light of the fact that the logical place to address the issue, Paragraph 4, was in fact modified after the parties learned that KPMG would produce a range of value, yet is silent as to the parties' intent.[110] The Plaintiffs allege that the midpoint assumption is implied and that the contract, with that implication, remains unambiguous.[111] I disagree—the parties could have agreed to one of a number of other metrics to reduce the range to a price point.

GT, for its part, says that no agreement was reached on the matter.[112] The assumption that no meeting of the minds on this point took place seems unlikely. The parties were aware of the issue when they executed the BLA.[113] It is clear that

---

[107] Post-Trial AB 42; Def.'s Pretrial Br. 24.
[108] *See* Answer, at Affirmative Defenses ¶ 10.
[109] *See* Section II.A *supra*.
[110] Pls.' Pretrial Br. 22–23; *see* Def.'s Pretrial Br. 23.
[111] Pls.' Pretrial Br. 23; Post-Trial OB 20.
[112] Post-Trial AB 42.
[113] *See* Pls.' Pretrial Br. 23; Post-Trial OB 20.

they reached a meeting of the minds with respect to the material elements of the contract. I therefore turn to extrinsic evidence.

That evidence is conflicting. John Brown, Jr., Murphy Marine's chairman of the board and who signed the BLA on behalf of Murphy Marine's stockholders, testified at trial that he proposed, at the July 6, 2018 meeting, that the parties employ a midpoint of the ranges as the price point.[114] Per Brown, Peter Richards, GT's CEO, "looked at [Brown] and said 'I think that makes sense to me.'"[115] Richards then looked at Jesper Boll, another GT principal, who nodded.[116] Richards then confirmed that the parties would "take the mid-range between the two prices."[117] That testimony was corroborated by Craig Mills,[118] the legal counsel for Murphy Marine.[119] GT attempts to discredit this testimony by discrediting Mills himself, noting that if Mills' testimony was true, he would have "overhear[d] the verbal negotiation and agreement of a critical part of the deal [the agreement to use a midpoint] and not ensure[d] that its details were incorporated into a written contract he (physically) and the parties were still revising!"[120] Per GT, "[s]uch an inference is unbelievable, and an effective abdication of Mills'[] responsibilities to his

---

[114] Trial Tr. 2, at 441:5–441:16.
[115] Trial Tr. 2, at 441:10–441:11.
[116] Trial Tr. 2, at 441:11–441:15.
[117] Trial Tr. 2, at 441:15–441:16.
[118] Trial Tr. 1, at 41:1–441:14.
[119] Trial Tr. 1, at 19:18–20:2.
[120] Post-Trial AB 45 (emphasis removed).

client."[121]   GT also attempts to discredit Brown's testimony.[122]   GT points to testimony that other participants did not recollect the Brown, Jr.-Richards-Boll interaction.[123]   GT does not, however, proffer its own interpretation of how the range-to-price-point issue was to be resolved, despite acknowledging that the parties signed the BLA *after* knowing that KPMG was only going to provide a range of values.[124]

On balance, I find the Plaintiffs' proffer of evidence more persuasive.  First, I note that Brown's testimony supports a resolution of the range issue that is neutral, and not self-serving; a self-serving (for the Plaintiffs) resolution of the issue of range-to-price-point would be to take the high point of the range, rather than the midpoint.  Second, I find it telling that GT does not proffer its own interpretation of how the range-to-price-point problem was resolved, instead arguing that, despite the parties' awareness of the problem, the parties signed an agreement that left the resolution undetermined.  Such a result is, to my mind, unlikely.  Finally, I assessed Brown's testimony during trial in this regard as forthright and believable.  Accordingly, I resolve the ambiguity of the range-to-price-point issue in favor of the

---

[121] Post-Trial AB 45.  Despite GT's heated argumentation, I find the criticism of Mills misplaced.
[122] Post-Trial AB 48–49.
[123] Post-Trial AB 46 (citing the trial testimony of Richards and Boll at Trial Tr. 1, at 189:3 – 189:21; Trial Tr. 2, at 337:2 – 337:7; Trial Tr. 2, at 406:24–408:6).
[124] Def.'s Pretrial Br. 24.

midpoint.[125]  I find that the intent of the parties was to include that method in their agreement, by a preponderance of the evidence.

For completeness' sake, I address GT's argument that the midpoint assumption is a separate contract that fails for want of consideration.  I find that the BLA was ambiguous as to resolution of the range issue, and that the parties agreed to an implied term—the midpoint.  The undisputed consideration for the BLA itself is sufficient to the implied term.

### III. CONCLUSION

I conclude that the BLA, alone, represents the whole agreement between GT and the owners of Murphy Marine regarding the purchase and sale of 100% of the equity interest of Murphy Marine.  I conclude that the BLA unambiguously prohibited KPMG from valuing Murphy Marine assuming privatization of the Port of Wilmington.  And finally, I conclude that extrinsic evidence supports the midpoint method as the agreed-upon method to select a price point from the range of value KPMG agreed to produce.  All other relevant issues remain for Phase II of this litigation.

---

[125] It is also worth noting that, even if the Defendant is correct that no agreement on how to resolve the range-to-price-point issue was reached, such a gap in the agreement would likely be filled by the Court under the implied covenant of good faith and fair dealing.  *In re El Paso Pipeline Partners, L.P. Deriv. Litig.*, 2014 WL 2768782, at \*16 (Del. Ch. June 12, 2014) ("The implied covenant is . . . the doctrine by which Delaware law cautiously supplies implied terms to fill gaps in the express provisions of an agreement.").  Given an agreement, the BLA, that otherwise addressed all material issues, I would likely have filled the gap in the BLA with a midpoint analysis in any event, as it is neutral to the parties.

27